1 | **KING & SPALDING LLP**
ARWEN R. JOHNSON (SBN 247583)
2 | *arwen.johnson@kslaw.com*
KELLY PERIGOE (SBN 268872)
3 | *kperigoe@kslaw.com*
633 West Fifth Street, Suite 1600
4 | Los Angeles, CA 90071
Telephone: (213) 443-4355
5 | Facsimile: (213) 443-4310

6 | Attorneys for Defendant NETFLIX, INC.

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

11

12 | NONA GAPRINDASHVILI, an individual,

13 | Plaintiff,

14 | v.

15 | NETFLIX, INC., a Delaware corporation, and DOES 1-50,

16

17 | Defendants.

18

Case No.  2:21-cv-07408-VAP-SK
*The Honorable Virginia A. Phillips*
*Courtroom: 8A*

**DEFENDANT NETFLIX, INC.'S NOTICE OF MOTION AND (1) SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER CALIFORNIA'S ANTI-SLAPP STATUTE, OR, IN THE ALTERNATIVE, (2) MOTION TO DISMISS PURSUANT TO RULE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES**

**[Declarations of Scott Frank and Arwen R. Johnson with Exhibits; and Proposed Order filed concurrently herewith]**

Date:   January 24, 2022
Time:   2:00 p.m.
Judge: The Honorable Virginia A. Phillips

Action Filed:  September 16, 2021
Trial Date:    Not Set

19

20

21

22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on January 24, 2022 at 2:00 p.m., or as soon thereafter as the matter may be heard before the Honorable Virginia A. Phillips of the above-entitled Court, located at United States Courthouse, 350 W. 1st Street, Los Angeles, CA 90012, Courtroom 8A, Defendant Netflix, Inc. ("Netflix") will and hereby does move the Court (the "Motion") (1) to strike the claims asserted against Netflix in the First Amended Complaint (the "FAC" (ECF No. 11)) of Plaintiff Nona Gaprindashvili ("Plaintiff") pursuant to California's anti-SLAPP statute, California Code of Civil Procedure section 425.16 *et seq*.; or (2) to dismiss Plaintiff's FAC, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

The grounds for the Motion are that (1) Plaintiff's FAC targets activity protected under the anti-SLAPP statute and Plaintiff cannot meet her burden of establishing a probability of success on any of her claims; and (2) Plaintiff in any event has failed to plausibly allege any claim for relief.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declarations of Scott Frank and Arwen R. Johnson and attached exhibits, the pleadings and records on file in this case, all matters of which the Court may take judicial notice, and such other or further material as may be presented at or before the hearing on the Motion.  This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place on October 25, 2021.  (Declaration of Arwen R. Johnson ("Johnson Decl."), ¶ 7.)

DATED:  November 1, 2021          KING & SPALDING LLP
                                                      ARWEN R. JOHNSON
                                                      KELLY PERIGOE


                                                      By: */s/ Arwen R. Johnson*

                                                          ARWEN R. JOHNSON
                                                          Attorneys for NETFLIX, INC.

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................... 1

II.  STATEMENT OF FACTS ......................................................................... 4

    A.  The Series ........................................................................................... 4

    B.  Plaintiff's Allegations ....................................................................... 6

    C.  The Creative Process and Context of the Line .................................. 7

III.  THE FAC SHOULD BE STRICKEN UNDER CALIFORNIA'S ANTI-SLAPP STATUTE ....................................................................................... 8

    A.  The Complaint Assails Netflix's Protected Activity ........................ 9

    B.  Plaintiff Cannot Establish That She Will Probably Prevail on the Merits of Her Claims ....................................................................... 11

        1.  The Series Is a Fictional Work That A Reasonable Viewer Would Not Construe as Conveying Objective Fact ........................... 12

        2.  A Reasonable Viewer Would Not Draw the Negative Implication that Plaintiff Alleges ................................................................... 15

        3.  The Allegedly Defamatory Statement Does Not Constitute Defamation *Per Se*, and Plaintiff Cannot Satisfy the Special-Damages Element of a Defamation *Per Quod* Claim ........................ 18

        4.  The Gist of the Line is Substantially True ......................................... 21

        5.  Plaintiff Cannot Prove Actual Malice by Clear and Convincing Evidence ......................................................................................... 23

IV.  ALTERNATIVELY, THE FAC SHOULD BE DISMISSED WITH PREJUDICE FOR FAILURE TO STATE A CLAIM FOR RELIEF UNDER RULE 12(b)(6) ...................................................................... 25

V.  CONCLUSION ...................................................................................... 25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Annette F. v. Sharon S.*,
  119 Cal.App.4th 1146 (2004) .................................................................. 25

*Baker v. Los Angeles Herald Examiner*,
  42 Cal.3d 254 (1986) .............................................................................. 17

*Balla v. Hall*,
  59 Cal.App.5th 652 (2021) ................................................. 11, 17, 18, 19

*Barnes-Hind, Inc. v. Super. Ct.*,
  181 Cal.App.3d 377 (1986) .................................................................... 19

*Bartholomew v. YouTube, LLC*,
  17 Cal.App.5th 1217 (2017) ................................................................... 21

*Bradbury v. Superior Court*,
  49 Cal.App.4th 1108 (1996) ................................................................... 11

*Braun v. Chronicle Publ'g Co.*,
  52 Cal.App.4th 1036 (1997) ................................................................... 22

*Brodeur v. Atlas Entm't, Inc.*,
  248 Cal.App.4th 665 (2016) .................................................... 10, 11, 17

*De Havilland v. FX Networks, LLC*,
  21 Cal.App.5th 845 (2018) ..........................................................*passim*

*Dougherty v. City of Covina*,
  654 F.3d 892 (9th Cir. 2011) ............................................................ 4, 25

*Fellows v. Nat'l Enquirer, Inc.*,
  42 Cal.3d 234 (1986) .............................................................................. 18

*Films of Distinction, Inc. v. Allegro Film Prods., Inc.*,
  12 F. Supp. 2d 1068 (C.D. Cal. 1998) ................................................... 13

ii

*Gallagher v. Philipps*,
    No. 20-CV-993 JLS (BLM), 2021 WL 4428996 (S.D. Cal. Sept. 27,
    2021) ................................................................................................. 19

*Good Gov't Grp. Of Seal Beach, Inc. v. Super. Ct. of L.A. Cnty.*,
    22 Cal.3d 672 (1978) ........................................................................ 24

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*,
    742 F.3d 414 (9th Cir. 2014) .............................................................. 8

*Guccione v. Hustler Magazine, Inc.*,
    800 F.2d 298 (2d Cir. 1986) .............................................................. 22

*Guglielmi v. Spelling-Goldberg Prods.*,
    25 Cal.3d 860 (1979) ................................................................. 12, 14

*Harkonen v. Fleming*,
    880 F.Supp.2d 1071 (N.D. Cal. 2012) ................................................ 8

*Heller v. NBC Universal, Inc.*,
    No. CV-15-09631-MWF-KS, 2016 WL 6583048 (C.D. Cal. June 29,
    2016) .......................................................................................... 17, 21

*Hughes v. Hughes*,
    122 Cal.App.4th 931 (2004) .............................................................. 22

*Issa v. Applegate*,
    31 Cal.App.5th 689 (2019) ................................................................ 12

*Khodorkovskaya v. Gay*,
    5 F.4th 80 (D.C. Cir. 2021) ............................................................... 13

*Klingebiel v. Lockheed Aircraft Corp.*,
    494 F.2d 345 (9th Cir. 1974) (per curiam) ......................................... 9

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2001) .............................................................. 8

*Masson v. New Yorker Magazine, Inc.*,
    501 U.S. 496 (1991) ............................................................... 3, 13, 21

*McGarry v. Univ. of San Diego*,
    154 Cal.App.4th 97 (2007) .......................................................*passim*

iii

*Metabolife Int'l, Inc. v. Wornick,*
   264 F.3d 832 (9th Cir. 2001) ................................................................... 8

*Mossack Fonseca v. Netflix Inc.,*
   No. CV 19-9330-CBM-AS(x), 2020 WL 8510342 (C.D. Cal. Dec. 23,
   2020) ................................................................................................ 9, 13, 15

*Navellier v. Sletten,*
   29 Cal.4th 82 (2002) ............................................................................... 8

*Nygard, Inc. v. Uusi-Kerttula,*
   159 Cal.App.4th 1027 (2008) .......................................................... 10, 16

*Partington v. Bugliosi,*
   56 F.3d 1147 (9th Cir. 1995) ..............................................2, 13, 15, 17

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
   890 F.3d 828 (9th Cir. 2018) ................................................................. 8

*Sarver v. Hurt Locker LLC,*
   No. 2:10-CV-09034-JHN, 2011 WL 11574477 (C.D. Cal. Oct. 13,
   2011) ..................................................................................................... 12

*Sarver v. Chartier,*
   813 F.3d 891 (9th Cir. 2016) ............................................................... 12

*Seelig v. Infinity Broad. Corp.,*
   97 Cal.App.4th 798 (2002) ................................................................... 10

*Summit Bank v. Rogers,*
   206 Cal.App.4th 669 (2012) ........................................................... 21, 22

*Tamkin v. CBS Broad., Inc.,*
   193 Cal.App.4th 133 (2011) .................................................... 9, 10, 11, 14

*Thomas v. Fry's Electronics, Inc.,*
   400 F.3d 1206 (9th Cir. 2005) ............................................................... 8

*Underwager v. Channel 9 Austl.,*
   69 F.3d 361 (9th Cir. 1995) ............................................................. 2, 15

*Vogel v. Felice,*
   127 Cal.App.4th 1006 (2005) ................................................... 16, 17, 22

*Winter v. DC Comics*,
  30 Cal.4th 881 (2003) ........................................................................................ 9

**Statutes**

Cal. Code Civ. Proc. § 48a(d)(2) ................................................................... 3, 19

Cal. Code Civ. Proc. § 425.16 ............................................................................ 1

Cal. Code Civ. Proc. § 425.16(a) ................................................................... 8, 11

Cal. Code Civ. Proc. § 425.16(e)(3)–(4) ............................................................ 9

**Other Authorities**

Inna Lazareva, *Georgian women ruled chess in the Soviet era. A new
  generation chases the same 'Queen's Gambit' glory*, Washington
  Post, Dec. 13, 2020 ........................................................................................ 20

Sammy Reshevsky, *The Art of Positional Play*, Chess Life & Review 217
  (April 1977) .................................................................................................... 23

Nona Gaprindashvili – *Legendary Chess Careers*, a book written by
  Tibor Karolyi, based on interviews with Plaintiff, published by Chess
  Evolution on January 1, 2016 ..................................................................... 7, 20

March 2020 documentary entitled "Glory to the Queen" .......................... 7, 20, 24

Netflix limited series "The Queen's Gambit" ...........................................*passim*

v

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

In October 2020, Netflix released *The Queen's Gambit* (the "Series"), a critically-acclaimed, popular fictional limited series based on a 1983 novel of the same name. Plaintiff Nona Gaprindashvili, an elite chess competitor, asserts claims against Netflix arising from a line of dialogue in the Series finale.  Because Plaintiff's meritless claims are designed to threaten free speech, as forbidden by the California legislature, they should be stricken or, alternatively, dismissed.

The Series follows the rise of fictional protagonist Elizabeth Harmon, a chess prodigy, through the male-dominated world of elite chess during the Cold War era. Plaintiff's allegations arise from a short scene in the Series finale, set 53 years ago in 1968 at the fictional "Moscow Invitational," in which a chess announcer speculates that Harmon's male competitors at that tournament likely would not have adequately prepared to face her.  The fictional announcer remarks during his commentary that Harmon's opponents might be familiar with Plaintiff, but "she's the female world champion and has never faced men" (the "Line").  Plaintiff alleges the Line is inaccurate by a few years and therefore false, defamatory, and highly offensive to a reasonable person.  In her First Amended Complaint ("FAC"), she asserts claims against Netflix under California law for (1) false light invasion of privacy and (2) defamation *per se*.

Plaintiff's claims are unavailing and should be stricken under California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16, or in the alternative, dismissed with prejudice under Rule 12(b)(6) for failure to state a claim.  As a threshold matter, Plaintiff's claims arise directly from Netflix's exercise of its constitutional right of free speech in connection with a public issue.  The Line is a part of a fictional television series that addresses a number of significant matters of public interest, including the challenges women faced competing in the male-dominated world of elite chess during the 1960s.  Netflix easily meets its burden on the first step of the analysis.  *See De Havilland v. FX Networks, LLC*, 21 Cal.App.5th 845, 849-50 (2018).

Plaintiff thus must show that her claims are legally sufficient and factually substantiated to meet her burden at step two. Plaintiff cannot meet this burden because she cannot prove a probability of prevailing on her claims for each of the following, independent reasons:

*First*, Plaintiff cannot show that a reasonable viewer of the Series would construe the Line as conveying a statement of objective fact, as required for both of her claims. Television shows often portray real people, but such people "do [] not own history" or "have the legal right to control, dictate, approve, disapprove, or veto the creator's portrayal of actual people." *De Havilland*, 21 Cal.App.5th at 849–50. The Line consists of speculation by a fictional chess announcer, about how fictional players might have prepared for a fictional tournament, in a fictional series, based on a novel. Even in more difficult cases involving works of historical fiction or docudramas—which the Series is not—courts recognize that viewers are "sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts." *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995); *see also De Havilland*, 21 Cal.App.5th at 866 (granting anti-SLAPP motion to strike defamation and false light claims by actress about statements in a docudrama).

*Second*, the Line is not defamatory, or even disparaging. It could only be construed as reflecting negatively on Plaintiff's abilities if a reasonable viewer would interpret it as insinuating that Plaintiff had not faced men as of 1968 *because she was "inferior" and not capable of doing so*. But that is an inference no reasonable viewer would draw from the Line or the tenor of the Series, which is about the challenges a female prodigy faces in the gender-segregated chess world. *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 366–67 (9th Cir. 1995). As the Series powerfully illustrates, there are many non-defamatory reasons (bias, gender segregation, etc.) why someone as skilled as Plaintiff might not have faced men as of 1968.

*Third*, although she styles her defamation claim as one for defamation *per se*, the defamatory implication that Plaintiff alleges depends on viewers being familiar with the

2

opportunities for female chess players in the Soviet Union in 1968. Such facts are not common knowledge. *See McGarry v. Univ. of San Diego*, 154 Cal.App.4th 97, 112 (2007). Accordingly, her claim is properly construed as a claim of defamation *per quod*, *see* Cal. Code Civ. Proc. § 48a(d)(2), which requires Plaintiff to plead and prove special damages (*i.e.*, economic losses) caused by the Line. As detailed below, she cannot do so. At most, the Line is about a moment in time that has no bearing on the decades of her career successes that followed and would not cause Plaintiff to experience lost economic opportunities.

**Fourth**, Plaintiff's claims also fail for the simple reason that the "gist or sting" of the Line is substantially true. *See Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting of the libelous charge be justified."). Plaintiff does not and cannot allege that she faced men in prestigious Soviet tournaments before 1968—*i.e.*, the gist of the Line as delivered in the context of the scene. Plaintiff alleges that she began facing men in a couple of tournaments a few years earlier, but none of those competitions were Soviet tournaments like the fictional "Moscow Invitational" in which Harmon competes in the Series finale. Moreover, the difference between 1963 and 1968 amounts to, at most, a minor inaccuracy in timing that is not actionable.

**Fifth**, Plaintiff, a public figure, cannot meet her burden to prove that Netflix acted with the requisite actual malice. Plaintiff's malice theory ignores that in adapting the novel for television, the Series' creator *removed* the disparaging statement that she was "not up to the level of" the fictional Moscow Invitational, and added the express recognition that she was the female world champion. The creator, moreover, relied on two chess experts to confirm the historical chess details of the screenplay adaptation. The Series' reference to Plaintiff was intended to recognize her, not disparage her. She cannot establish through clear and convincing evidence that Netflix acted "in the hope of insinuating a defamatory import." *De Havilland*, 21 Cal.App.5th at 869-70.

The First Amendment protects the creator's artistic license to include the Line in

the fictional Series.  Because Plaintiff cannot meet her anti-SLAPP burden, the FAC must be dismissed with prejudice.

Alternatively, for the reasons set forth in Sections III.B.1–4 below—all of which can be decided based on the FAC and Series alone—Plaintiff fails to state a claim for relief under Rule 12(b)(6).  Because no amount of repleading could transform the Line into actionable defamation, the claims should be dismissed without leave to amend.  *See Dougherty v. City of Covina*, 654 F.3d 892, 901 (9th Cir. 2011).

## II.     STATEMENT OF FACTS

### A.     *The Series*

Netflix released the Series to its members in October 2020 through its online streaming service.  (FAC ¶ 34.)  The Series was a critical success and was widely viewed.  (*Id*.)  It is a seven-episode limited series adapted by director and producer Scott Frank from a 1983 novel of the same name by Walter Tevis.  (Johnson Decl., Ex. 1 ("Ex. 1"), *e.g.*, Ep. 1 at 56:43; *see also* Declaration of Scott Frank ("Frank Decl."), ¶¶ 1, 3–4.)  The Series tells the story of the fictional Elizabeth Harmon.  It follows Harmon's life and career as an orphan who becomes a chess prodigy and later a star chess player in the male-dominated and largely gender-segregated chess world of the 1960s, while she grapples with addiction and finds her support system.  (Ex. 1; Frank Decl., ¶¶ 4, 14–15.)  The Series explores themes of drug addiction, chosen family, the cost of genius, the rejection of gender norms, and the value of collectivism over individualism in the context of the Cold War.  (Ex. 1; Frank Decl., ¶ 4.)

The Series, like the novel, is a work of fiction.  (Ex. 1, Ep. 1 at 57:59; Frank Decl., ¶ 5.)  Harmon is a fictional character.  (*Id*.)  Her chess opponents and the tournaments in which she competes are fictional.  (*Id.*)  The Series, however, includes references to real events and people to enhance the realism.  (Frank Decl., ¶ 6.)  To that end, Bruce Pandolfini, one of the premier chess teachers in the world (and Tevis's chess consultant during the writing of the novel), and Garry Kasparov, a former world champion and expert in Soviet chess during the relevant era, consulted on the adaption

of the Series and reviewed the scripts. (*Id.* ¶ 19.)

While the Series largely adheres to the novel, additional context for each chess tournament was necessary to set the emotional stakes for the Series and Harmon's rise to predominance in the chess world to ensure that the Series was sufficiently engaging for a viewer of a dramatic, fictional, television series. (Frank Decl., ¶¶ 7–8.) For example, the prestige and prominence of the tournaments in which Harmon competes steadily increase throughout the Series. (*Id.* ¶ 8; *see generally* Ex. 1.) Harmon first competes in a local tournament, held in her Kentucky hometown. (Ex. 1, Ep. 2 at 27:05–28:01, 32:40–34:45; Frank Decl. ¶ 9.) She goes on to play tournaments in Cincinnati, Pittsburgh, Houston, Las Vegas, and Mexico City. (Ex. 1, Ep. 3 at 1:34–10:00 (Cincinnati), 10:35–13:38 (Pittsburgh and Houston), 22:54–41:00 (Las Vegas); *id.*, Ep. 4 at 9:50–11:40 (Mexico City); Frank Decl., ¶ 8.) Near the end of the Series, Harmon competes in even more prestigious and exclusive tournaments: the U.S. Championship in Ohio, which she wins; and a Paris invitational. (Ex. 1, Ep. 5 at 27:38–41:40 (Ohio); *id.*, Ep. 6 at 19:45–33:40 (Paris); Frank Decl., ¶ 8) Because of her status as reigning U.S. Champion, Harmon is invited to compete in the fictional 1968 Moscow Invitational. (Ex. 1, Ep. 5 at 42:23–48; Ep. 7 at 26:35–29:52.)

The fictional Moscow Invitational is portrayed as a highly prestigious tournament, as the Soviets were the pinnacle of competitive chess at that time. (Ex. 1, Ep. 5 at 41:40–45:27; *id.*, Ep. 6 at 7:10–9:40; Frank Decl., ¶ 10.) The Series also depicts sexism and gender-segregation in the male-dominated world of 1960s chess. (Frank Decl., ¶ 4.) In Harmon's first tournament, the male organizers discourage her from competing due to the lack of a women's section. (Ex. 1, Ep. 2 at 33:06–34:02.) Later, reporters ask her how it feels "to be a girl among all those men" (Ex. 1, Ep. 3 at 13:50–14:23), and when a stranger asks if she is the "U.S. Women's Champion," she replies, "U.S. Open Co-Champion," a genderless title. (Ex. 1, Ep. 4 at 1:27–43.)

At the culminating Moscow Invitational, referred to as the "Tournament of Champions," (Ex. 1, Ep. 7 at 30:36), Harmon is the only American and the only female

chess player.  (*Id.* at 28:25–30:02.)  Nevertheless, Harmon triumphs over her internal demons, and the low expectations for her based on her nationality and gender, to win the tournament by drawing on her chosen family of American chess players for support. (*Id.* at 51:37–59:54.)

The end credits of every episode expressly state that the Series is "based upon the novel of Walter Tevis" immediately after identifying the director, screenwriter, and creators.  (Ex. 1, Ep. 1 at 56:43; Ep. 2 at 1:02:29; Ep. 3 at 43:35; Ep. 4 at 46:04; Ep. 5 at 45:36; Ep. 6 at 57:21; Ep. 7 at 1:04:52; Frank Decl., ¶ 5.)  The credits also note:

> [T]he characters and events depicted in this program are fictitious.  No depiction of actual persons or events is intended.

(Ex. 1, Ep. 1 at 57:59; Ep. 2 at 1:03:51; Ep. 3 at 45:01; Ep. 4 at 47:20; Ep. 5 at 46:59; Ep. 6 at 58:46; Ep. 7 at 1:06:03.)

### B.    *Plaintiff's Allegations*

Plaintiff's FAC for defamation *per se* and false light is based on a single reference to her in a line of dialogue in one episode of the Series.  While Harmon is playing in the Moscow Invitational, a tournament announcer says of her opponents:

> As far as they knew, Harmon's level of play wasn't up to theirs.  Someone like Laev probably didn't spend a lot of time preparing for their match. Elizabeth Harmon's not at all an important player by their standards.  The only unusual thing about her, really, is her sex.  And even that's not unique in Russia.  **There's Nona Gaprindashvili, but she's the female world champion and has never faced men.**  My guess is Laev was expecting an easy win, and not at all the 27-move thrashing Beth Harmon just gave him.

(Ex. 1, Ep. 7 at 29:45–30:31; FAC ¶ 5) (emphasis added).

Plaintiff alleges that by "impugning that she did not face men, or was inferior to men," the Line is "manifestly defamatory."  (*Id.* ¶ 77.)  She alleges that the Line is false because she had played matches against male chess players by 1968.  (*Id.* ¶ 7.)  The FAC does not allege, however, that Plaintiff had competed against men in a prestigious Soviet competition before 1968.  Her most notable chess competitions against men and co-ed titles, as identified in the FAC, took place after 1968, including Plaintiff's tie for

6

second place at Sandomierz in 1976, tie for first place at Lone Pine in 1977, and tie for second place at Dortmund in 1978.  (*Id.* ¶ 25.)  Plaintiff alleges that she became the first woman to be awarded the title of "Grandmaster" in 1978, as a result of her 1977 Lone Pine performance.  (*Id.* ¶ 28.)

### C.     The Creative Process and Context of the Line

The screenwriter who adapted the novel for the Series included the Line to emphasize the male-dominated, gender-segregated world of 1960s chess, especially in the Soviet Union, in furtherance of the Series' narrative arc.  (Frank Decl., ¶¶ 13-15.)

The Line was changed from the following statement by the novel's narrator:

> As far as they knew, [Harmon's] level of play was roughly that of Benny Watts, and men like Laev would not devote much time to preparation for playing Benny.  She was not an important player by their standards; the only unusual thing about her was her sex; and even that wasn't unique in Russia.  There was Nona Gaprindashvili, not up to the level of this tournament, but a player who had met all these Russian Grandmasters many times before.  Laev would be expecting an easy win.

(FAC ¶ 3.)  The Line thus deviates from the novel by shifting the reason the fictional, male Soviet chess players would not have faced Plaintiff from her "not [being] up to the level of this tournament"—a disparaging comment (that Plaintiff does not think is defamatory (*id.* ¶ 64))—to her being the "female world champion."  In making this change, the screenwriter did not intend to disparage Plaintiff, but rather to recognize her status, in 1968, as the reigning Women's World Champion.  (Frank Decl., ¶ 18.)

In adapting the screenplay, the screenwriter and his team spent many hours researching chess and consulting with chess experts Pandolfini and Kasparov.  (Frank Decl., ¶ 19.)  All of the scripts for the Series were provided to Pandolfini and Kasparov to review for accuracy, and neither expert identified any issue with the Line.  (*Id.* at ¶ 20.)  Indeed, the most widely available information about Plaintiff described her as a long-reigning female world champion whose most notable success among men occurred in the 1970s.  (*See* Johnson Decl., ¶ 4, Ex. 3 (*Legendary Chess Careers: Nona Gaprindashvili*); *id.* ¶ 3, Ex. 2 (*Glory to the Queen*).)

## III.   THE FAC SHOULD BE STRICKEN UNDER CALIFORNIA'S ANTI-SLAPP STATUTE

California's anti-SLAPP statute enables a defendant to strike meritless claims that would otherwise chill the exercise of its constitutional right to free speech.[1]  *See De Havilland*, 21 Cal.App.5th at 854-55; *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).  Consistent with the statute's explicit direction, *see* Cal. Code Civ. Proc. § 425.16(a), federal courts construe the statute broadly.  *Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 421 (9th Cir. 2014).

Resolution of an anti-SLAPP motion proceeds in two steps.  ***First***, the defendant must make "a threshold showing that the challenged cause of action is one arising from protected activity." *Navellier v. Sletten*, 29 Cal.4th 82, 88 (2002).  ***Second***, the court must strike the challenged claim unless the plaintiff meets the burden to show "a probability that [she] will prevail on each element" of the claim.  *Harkonen v. Fleming*, 880 F.Supp.2d 1071, 1078 (N.D. Cal. 2012).  Where, as here with respect to the grounds in Sections III.B.1-4, an anti-SLAPP motion is based on a complaint's facial legal deficiencies, the motion is "treated in the same manner as a motion under Rule 12(b)(6)."  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833–34 (9th Cir. 2018).  As to the factual sufficiency of the actual malice element, Section III.B.5, the Rule 56 standard applies.  *Id.*

The Court may properly consider the Series in determining the legal sufficiency of the claims (*see* Sections III.B.1-4, below) because it was referenced in the FAC, the Series is "central to [Plaintiff's] claims," and the authenticity of the copy of the Series, attached to the Johnson Declaration as Exhibit 1, cannot be contested.  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2001).

As set forth below, Netflix easily carries its burden on the first step of the

---

[1] California's anti-SLAPP statute applies where, as here, a plaintiff sues in federal court based on diversity jurisdiction. *Thomas v. Fry's Electronics, Inc.*, 400 F.3d 1206 (9th Cir. 2005) (per curiam).

1   analysis, whereas Plaintiff cannot make her required showing on the second step.

2          **A.**     ***The Complaint Assails Netflix's Protected Activity.***

3        To satisfy the first step, Netflix need only make a *prima facie* showing that

4   Plaintiff's claims arise from a "written or oral statement" made "in a place open to the

5   public or a public forum in connection with an issue of public interest," or in furtherance

6   of the exercise of "the constitutional right of free speech in connection with a public

7   issue or an issue of public interest." Cal. Code Civ. Proc. § 425.16(e)(3)–(4). Netflix

8   easily does so. Plaintiff's claims fall directly under Section 425.16(e)(3) because they

9   concern a statement "made in a place open to the public or a public forum." Plaintiff's

10   defamation and false light claims arise from a line of dialogue in the Series, which was

11   released through Netflix's online streaming service in October 2020 and reportedly

12   viewed by over 60 million households as of November 23, 2020. (FAC ¶¶ 5–7, 34.)

13   Such a widely watched television series qualifies as a "public forum" under the anti-

14   SLAPP statute. *Cf. De Havilland*, 21 Cal.App.5th at 856-57 (plaintiff conceded that

15   television miniseries was part of a public forum);[2] *Mossack Fonseca v. Netflix Inc.*, No.

16   CV 19-9330-CBM-AS(x), 2020 WL 8510342, at *2 (C.D. Cal. Dec. 23, 2020) (same

17   with respect to film).

18        Plaintiff's claims also fall squarely within Section 425.16(e)(4) because the

19   "creation of a television show is an exercise of free speech." *Tamkin v. CBS Broad.,*

20   *Inc.*, 193 Cal.App.4th 133, 143 (2011). "The First Amendment to the United States

21   Constitution protects the creative elements of an artistic work," which extends to the

22   creation of television shows. *Winter v. DC Comics*, 30 Cal.4th 881, 891-92 (2003); *see*

23   *also De Havilland*, 21 Cal.App.5th at 850 (docudrama about the rivalry between

24   Hollywood actresses protected by anti-SLAPP statute). Here, the Line was delivered

25       

26   [2] Federal courts applying California law must follow decisions of the California Court of Appeals "where the Supreme Court of California has not spoken on the question,"

27   unless there is "convincing evidence that the highest court of the state would decide differently." *Klingebiel v. Lockheed Aircraft Corp.*, 494 F.2d 345, 346 n.2 (9th Cir.

28   1974) (per curiam).

by a fictional character in the Series—making it the product of Netflix's creation and production of a television show.  Acts that "advance or assist in the creation, casting, and broadcasting of an episode of a popular television show" fall within the scope of protected First Amendment activity.  *Tamkin*, 193 Cal.App.4th at 143.  Just as in *Tamkin*, the acts underlying this litigation were in furtherance of the creation, casting, and broadcasting of the Series and are accordingly entitled to First Amendment protection.

Finally, both Sections 425.16(e)(3) and (e)(4) apply to speech made in connection with an issue of "public interest," which broadly encompasses "any issue in which the public is interested," regardless of the issue's significance.  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal.App.4th 1027, 1042 (2008) (statements about Finnish businessman and celebrity constituted issue of public interest).  The statement here satisfies that low bar.  As Plaintiff recognizes, the Line is part of the announcer's broader speculation that "the male players in the tournament did not take Harmon seriously as an opponent." (FAC ¶ 42.)  Sexism and gender-segregation in the chess world (and society more generally) are recurring themes in the Series and paradigmatic examples of issues of public interest protected by the anti-SLAPP statute.  *See, e.g.*, *Brodeur v. Atlas Entm't, Inc.*, 248 Cal.App.4th 665, 675 (2016) (public interest in *American Hustle* scene regarding the possible negative consequences of exposure to microwave radiation); *Tamkin*, 193 Cal.App.4th at 143 (television show's use of the names of private, unknown relators as guest characters involved an issue of public interest regarding "the creation and broadcasting of that episode"); *Seelig v. Infinity Broad. Corp.*, 97 Cal.App.4th 798, 807–08 (2002) (public interest in game show meant that radio host's mockery of one of the contestants satisfied the first step of the analysis).  In addition, the Line was made in connection with Plaintiff, an undisputed public figure, who would herself be an issue of public interest.  *See Brodeur*, 248 Cal.App.4th at 675 (statement made in connection with a public figure who was a "well-known author in the environmental field" qualified as a matter of public interest).

California's anti-SLAPP statute must be read "broadly" so as to maximize the protection afforded to acts in furtherance of the constitutionally protected right to free speech.  Cal. Code Civ. Proc. § 425.16(a); *see also Bradbury v. Superior Court*, 49 Cal.App.4th 1108, 1114 & n.3 (1996).  Plaintiff's defamation and false light claims arise from an exercise of free speech in connection with an issue of public interest.

### B.    *Plaintiff Cannot Establish That She Will Probably Prevail on the Merits of Her Claims.*

Because Netflix satisfies its threshold showing that the anti-SLAPP statute applies, the burden shifts to Plaintiff to demonstrate both that she has a legally sufficient claim *and* prove with admissible evidence there is a probability of her prevailing on that claim.  *De Havilland*, 21 Cal.App.5th at 855.

As Plaintiff's claim for false light invasion of privacy is "in substance equivalent" to defamation, the survival of that claim depends on her ability to show a probability of success on the merits of her defamation claim.  *Brodeur*, 248 Cal.App.4th at 678; *see also Tamkin*, 193 Cal.App.4th at 149.  To prevail on her defamation claim, Plaintiff must demonstrate that Netflix intentionally published a comment that a reasonable viewer would regard as a statement of fact that is "false, unprivileged, and has a natural tendency to injure or which causes special damage."  *Balla v. Hall*, 59 Cal.App.5th 652, 675 (2021).  Because Plaintiff is a public figure, she must also show by clear and convincing evidence that Netflix published the comment at issue with "actual malice," meaning with subjective knowledge or reckless disregard as to its truth or falsity.[3]  *McGarry*, 154 Cal.App.5th at 114.

---

[3] Among other things, Plaintiff is the first woman to be honored with the rank of International Chess Grandmaster among men, a "national hero in Georgia," a former Georgian politician, a recipient of the Georgia Order of Excellence, and the subject of a recent documentary film—all of which are internationally recognized accomplishments that explain why Plaintiff concedes that she is a public figure.  (FAC ¶¶ 28–30, 71.) *See also Balla*, 59 Cal.App.5th at 716 (an all-purpose public figure refers to someone who "has achieved such pervasive fame or notoriety that [she] becomes a public figure for all purposes and in all contexts" (cleaned up)).

11

Plaintiff cannot meet her burden as to several elements of her defamation claim, each of which provides an independent basis to grant Netflix's motion:  (1) a reasonable viewer would not interpret the fictional Series as making assertions of fact, (2) the Line is not defamatory, (3) special damages should not be presumed, and Plaintiff cannot prove them, (4) the gist of the Line is substantially true, and (5) Plaintiff cannot prove that Netflix acted with actual malice.  Plaintiff's defamation claim is both legally insufficient and unsupported by admissible evidence, and her FAC must be stricken.

## 1. The Series Is a Fictional Work That A Reasonable Viewer Would Not Construe as Conveying Objective Fact.

As a threshold matter, "a reasonable viewer, watching the scene [] in [its] original context," would not "have understood [it] to convey statements of fact." *De Havilland*, 21 Cal.App.5th at 866.  Whether statements such as the Line "convey the requisite factual implication is ordinarily a question of law for the court." *Issa v. Applegate*, 31 Cal.App.5th 689, 703 (2019).  Here, the Series is a fictional work, based upon another fictional work (the novel).  Elizabeth Harmon is not a real person, and the Series does not purport to be a journalistic or documentarian account of real events, or even a "docudrama."  The character speaking the line is a fictitious announcer, who himself would be affected by the bias inherent in competitive chess at the time.  No reasonable viewer would understand the Series to be asserting objective facts.

As a matter of law, it is not reasonable for a viewer to accept statements in fictional works—even those that portray real characters—as assertions of fact. "Fictional works have no obligation to the truth." *Sarver v. Hurt Locker LLC*, No. 2:10-CV-09034-JHN, 2011 WL 11574477, at *8 (C.D. Cal. Oct. 13, 2011), aff'd sub nom, *Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016); *see also Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal.3d 860, 871 (1979) (Bird, J., concurring) ("All fiction, by definition, eschews an obligation to be faithful to historical truth.") (cited in *Sarver*, 2011 WL 11574477, at *8).   Rather, fictional works are known to involve worlds in which "drama and dramatic license are generally the coin of the realm," and the creators

are understood to be artists, rather than "journalists or documentarians." *Khodorkovskaya v. Gay*, 5 F.4th 80, 85 (D.C. Cir. 2021) (theater production's depiction of "its character Inna [the wife of a Russian oligarch] could not reasonably be understood to communicate actual facts about the real-life Inna").

Even as to docudramas, which blend fact and fiction, courts recognize that viewers are "sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts." *Partington*, 56 F.3d at 1155 ("[T]he general tenor of the docudrama [] tends to negate the impression that the statements involved represented a false assertion of objective fact."); *see also Masson*, 501 U.S. at 512-13 ("[S]tatements made in 'a so-called docudrama or historical fiction' should not be accepted unquestioningly."); *De Havilland*, 21 Cal.App.5th at 866 ("Viewers are generally familiar with dramatized, fact-based movies and miniseries in which scenes, conversations, and even characters are fictionalized and imagined."); *Films of Distinction, Inc. v. Allegro Film Prods., Inc*., 12 F. Supp. 2d 1068, 1081 (C.D. Cal. 1998) (dismissing defamation claim where "the Film as a whole is clearly a work of fiction" that a reasonable viewer would understand not to involve objective fact).

The disclosures in each episode that the Series is a work of fiction based on a novel (*see, e.g.,* Ex. 1, Ep. 7 at 1:04:52; *id.*, Ep. 7 at 1:06:03), reinforces that the Series is of a genre that a reasonable viewer would not interpret as containing statements of fact. *Mossack Fonseca*, 2020 WL 8510342, at *4 (disclaimers about how a film was fictionalized demonstrate that no reasonable viewer would interpret the film to convey objective fact); *cf. Masson*, 501 U.S. at 512-13 (where a work acknowledges that it is docudrama or historical fiction, that "might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed").

Indeed, in discussing the novel, Plaintiff acknowledges that a fiction-writer is "free to create a fictional tournament and decide in his fictional world that Plaintiff was not up to the level of competition he had created in his fictional world."  (FAC ¶ 64.) By that same logic, Netflix, in adapting Tevis's fictional novel into a fictional television

13

series, is free to create a fictionalized world where the fictional Moscow Invitational is the type of tournament in which Plaintiff would not have participated given the male-dominated and gender-segregated world of chess in the 1960s.

Not only is the Series fiction, but the Line's context further demonstrates that a reasonable viewer would not interpret it as fact. The Line is not stated by an objective narrator, but rather as dialogue by a fictional character who is, himself, a part of the gender-segregated chess world that the Series depicts. (Ex. 1, Ep. 7 at 29:52–31:32.) Moreover, the Line is not the only one the announcer makes that invokes real-life chess players. (*Id.* at 35:30–36:20.) At a subsequent match, that same announcer remarks that a fictional male Soviet chess player (Luchenkov) was renowned for beating several accomplished opponents who are real historical figures (*Id.*) The decision to ground the fictional characters' performance in the context of real grandmasters is a clear exercise of artistic license—increasing the likelihood of the viewer's understanding that the announcer's statements are not intended to convey objective facts. *Guglielmi*, 25 Cal.3d at 871 (Bird, J., concurring) ("[T]he author who denotes his work as fiction proclaims his literary license and indifference to 'the facts.'").

While Plaintiff criticizes Netflix's references to historical figures as unnecessary, (FAC ¶ 11), that argument is unavailing. Whether the reference is "necessary," in Plaintiff's mind or otherwise, is not the standard. Because the "creative process must be unfettered," courts preclude juries from "dissect[ing] the creative process in order to determine what was necessary to achieve the final product and what was not, and to impose liability for that portion deemed unnecessary." *Tamkin*, 193 Cal.App.4th at 144-45 (cleaned up) (granting anti-SLAPP motion). Indeed, "[c]ontemporary events, symbols and people are regularly used in fictional works," and "[n]o author should be forced into creating mythological worlds or characters wholly divorced from reality." *Guglielmi*, 25 Cal.3d at 869 (1979) (Bird, J., concurring).

Because reasonable viewers would not interpret the Line as conveying objective fact, the Court should dismiss the FAC on this basis alone and need not reach any other

14

elements of Plaintiff's claims.  *See Mossack*, 2020 WL 8510342, at *4 (granting anti-SLAPP motion where "no reasonable viewer of the Film would interpret the Film as conveying 'assertions of objective fact'"); *Partington*, 56 F.3d at 1153 (affirming summary judgment for defendant where "the general and specific contexts in which the defendants' contested statements were made do not imply the assertion of an objective fact," even assuming that the docudrama statements carried a negative implication).

### 2.     A Reasonable Viewer Would Not Draw the Negative Implication that Plaintiff Alleges.

Not only would a reasonable viewer not interpret the Line as conveying a statement of objective fact, but no reasonable viewer would interpret the Line as defamatory.  Plaintiff alleges that, by stating that she had "never faced men," the Series "degrade[s] Gaprindashvili by impugning that she did not face men, *or was inferior to men*."  (FAC ¶ 77 (emphasis added).)  Courts "decide as a matter of law whether a reasonable viewer" would interpret statements like the Line as "defamatory or highly offensive to a reasonable person."  *De Havilland*, 21 Cal.App.5th at 865–66.  Plaintiff's allegation about the Line's supposedly defamatory implication is unavailing.

*First*, a reasonable viewer would never conclude that Plaintiff was in any way "inferior" to her male counterparts given the context of the Line and the general tenor of the Series as a whole.  *See Underwager*, 69 F.3d at 366 (to analyze a defamation claim, courts must "examine the totality of the circumstances," such as "the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work.").  The Series focuses on depicting the many barriers that women faced while attempting to advance through the male-dominated world of elite competitive chess during the 1960s—even when fortunate enough to possess a prodigy-level talent for chess.  The alleged implication that Plaintiff had not faced men because she was inferior not only appears nowhere in the Series, but also is entirely inconsistent with the Series' portrayal of the structural barriers that impeded women's advancement in elite chess during the 1960s.

For example, when Harmon enters her first chess tournament in Kentucky, the male students discourage her from competing due to the lack of a women's section and their assumption that she will get "eaten alive" by her male counterparts; Harmon proceeds to win. (Ex. 1, Ep. 2 at 33:06–59.)  After a series of victories leads to Harmon being interviewed by *Life* magazine, the female reporter focuses on how it feels to be the sole woman "among all those men," implies that Harmon's dedication to chess reflects an undiagnosed form of psychosis, and recommends that Harmon switch to bridge.  (*Id.*, Ep. 3 at 14:02-16:53.)  Even when Harmon establishes herself as an accomplished chess competitor, she continues to receive sexist questions from reporters and endures male competitors' resistance to the idea of facing a woman.  (*Id.*, Ep. 4 at 33:34–34:45 (male Soviet players downplay Harmon's skill and criticize her for a tendency to "get angry" when under attack "like all women"); *id.*, Ep. 6 at 20:37–21:11 (reporter asks Harmon at the Paris tournament how she would respond to those who criticize her for being too glamorous); *id.*, Ep. 7 at 33:02–26 (one of Harmon's male Soviet competitors becomes so angry at his defeat that he storms out without shaking her hand).)  After witnessing the immense challenges that Harmon needed to overcome to compete at the Moscow Invitational, it is implausible to think that a reasonable viewer would infer that Plaintiff, the female world champion, had not faced men in elite tournaments as of 1968 due to some inferiority on Plaintiff's part, as opposed to the same discrimination and structural barriers in the chess world that undermined Harmon.

*Second*, even if the Line implied that Plaintiff was inferior to male players (which it does not), such an implication would constitute a non-actionable statement of opinion. Courts distinguish between "statements of fact" and "statements of opinion," where the latter may only form the basis of a successful defamation claim if it "implies a false assertion of fact."  *See Nygard*, 159 Cal.App.4th at 1048; *see also Vogel v. Felice*, 127 Cal.App.4th 1006, 1019-20 (2005) (statement may only give rise to defamation claim if it is "found to convey a provably false factual assertion") (internal quotation marks omitted).  The question is a matter of law "to be decided by the court" based on whether

the average viewer would interpret the statement as one of fact or opinion under the "totality of the circumstances." *Baker v. Los Angeles Herald Examiner*, 42 Cal.3d 254, 260 (1986); *see also Brodeur*, 248 Cal.App.4th at 680-81.

Subjective assessments of a person's professional competence, like the one Plaintiff alleges, do not satisfy that requirement. *See Partington*, 56 F.3d at 1156 (criticizing a lawyer for "represent[ing] his client poorly" constituted nonactionable opinion); *Vogel*, 127 Cal.App.4th at 1019-20 (accusing candidates for public office of being "Dumb Asses" "communicates no factual proposition susceptible of proof or refutation"); *Heller v. NBC Universal, Inc.*, No. CV-15-09631-MWF-KS, 2016 WL 6583048, at *6 (C.D. Cal. June 29, 2016) (statements regarding the plaintiff's professional performance not actionable because "they are not ordinarily susceptible of being proved true or false"). The same reasoning applies here—the alleged implication that Plaintiff was "inferior" constitutes a subjective assessment of Plaintiff's professional skill that is not provably false.

Finally, even if the subjective implication of "inferiority" were provably false (which it is not), the purported inferiority would be limited to a moment in time—*as of 1968*, when the fictional Moscow Invitational takes place. The Line has no bearing on Plaintiff's many accomplishments in the intervening decades—including her victories against men during the 1970s that led to her being recognized as the first female Grandmaster in 1978—and thus no present tendency to "directly to injure [her] in respect to [her] office, profession, trade, or business." *Balla*, 59 Cal.App.5th at 675 (quoting Civ. Code § 46, subd. 3).[4]

---

[4] Plaintiff's references to cherry-picked audience reactions to the Line do not undermine this analysis. (*See* FAC ¶¶ 48–58). Relying on such anecdotal evidence is inconsistent with the settled practice of assessing a statement's defamatory import based on how a "reasonable fact finder" would interpret it. *See Balla*, 59 Cal.App.5th at 678 ("The pertinent question is whether a reasonable fact finder could conclude that the statements" were defamatory.). Replacing the reasonable-viewer standard with a subjective one would be unworkable and has no basis in case law.

1    Thus, even if this Court were to adopt Plaintiff's implausible interpretation of the
2    Line, the alleged implication would not give rise to an actionable defamation claim.

3          **3.    The Allegedly Defamatory Statement Does Not Constitute**
4          **Defamation *Per Se*, and Plaintiff Cannot Satisfy the Special-**
5          **Damages Element of a Defamation *Per Quod* Claim.**

6    Plaintiff's claim that the Series allegedly defamed her by implying she was
7    inferior to male chess players is properly analyzed as a claim for defamation *per quod*,
8    not defamation *per se*.  And she cannot show a probability of proving the required
9    special damages element of a *per quod* claim or an attendant false light claim.

10    A statement is defamatory *per se* if "it contains a charge by implication from the
11    language employed by the speaker and a listener could understand the defamatory
12    meaning without the necessity of knowing extrinsic explanatory matter."  *McGarry*,
13    154 Cal.App.4th at 112.  If, however, the audience "would be able to recognize a
14    defamatory meaning only by virtue of his or her knowledge of specific facts and
15    circumstances, extrinsic  to the publication, which are not matters of common
16    knowledge rationally attributable to all reasonable persons," then the statement must be
17    considered defamation *per quod*, requiring proof of special damages.  *Id*.  The same is
18    true for Plaintiff's false light claim.  *Fellows v. Nat'l Enquirer, Inc*., 42 Cal.3d 234, 251
19    (1986) ("[W]henever a claim for false light invasion of privacy is based on language
20    that is defamatory [*per quod*], pleading and proof of special damages are required.").

21    In *Balla v. Hall*, for example, two city council members and a local developer
22    sued an unsuccessful city council candidate and the candidate's campaign manager for
23    defamation and false light.  59 Cal.App.5th at 658.  The court held that the defendants'
24    statements that alleged quid pro quo bribery were "susceptible of a defamatory *per se*
25    meaning" because the conduct would be an improper conflict of interest.  *Id*.  By
26    contrast, the court held that a campaign advertisement that implied that one of the
27    council members supported the defendant candidate was not defamatory *per se* because
28    "[f]or readers to perceive the advertisement as harmful to [plaintiff's] reputation, they

would need to know, at a minimum, who [the defendant candidate] was and something about his views and position and position within the Solona Beach community." *Id*. at 690.  The court thus granted the anti-SLAPP motion as to that claim for failure to show special damages.  *Id.*; *see also Barnes-Hind, Inc. v. Super. Ct*., 181 Cal.App.3d 377 (1986) (plaintiff manufacturer did not state cause of action for libel *per se* where defendant competitor's alleged representations were defamatory, if at all, only by virtue of special knowledge of doctors to whom representations were made).

Applying this distinction, the Line is not defamatory *per se*.  Just as the plaintiff's support of a politician is meaningless to a reader who does not know the politician's views, the nature of Plaintiff's participation in chess tournaments is meaningless to a person who is not familiar with competitive Soviet chess in the 1960s.  A reasonable viewer could not know whether Plaintiff not having "faced" men as of 1968 was the result of her own inferiority (as opposed to, for example, systemic bias against women) *unless* the viewer was familiar with the opportunities for female chess players in the Soviet Union at that time.  Such facts are not common knowledge.

Plaintiff therefore must plead and prove special damages resulting from the alleged defamation, which include "all damages that plaintiff alleges and proves that he or she has suffered in respect to his or her property, business, trade, profession, or occupation, including the amounts of money the plaintiff alleges and proves he or she expended as a result of the alleged libel."  Cal. Code Civ. Proc. § 48a(d)(2); *see also Gallagher v. Philipps*, No. 20-CV-993 JLS (BLM), 2021 WL 4428996, at *15-16 (S.D. Cal. Sept. 27, 2021) (special damages include (a) economic loss, which must be specific (such as the value of lost time at work or lost clients) and not rely on speculation about the loss of prospective employment; or (b) "medical or psychological treatment" that was sought out as a result of the defamation) (internal citation omitted).

Plaintiff does not allege, nor can she allege, that she incurred these specific types of damages as a proximate result of the alleged defamation.  She alleges that her "current participation in the chess world, and her ability to earn income from that

19

participation, remains tied to her historical success and accomplishments" (FAC ¶ 77), but cannot allege resulting economic damages—she has explained that her participation in Senior Chess tournaments is for her own enjoyment, not money:

> Why do I take part in senior chess championships? . . . It's just that chess makes me live longer.  Although I didn't play well today, I still feel okay.  I have positive emotions because this is my world.

(*See* Johnson Decl., Ex. 2 at 5:00–5:16).  To the extent that Plaintiff argues that the Line has negatively impacted her "brand," Plaintiff will not be able to show this.  To the contrary, Plaintiff's career—primarily familiar to chess enthusiasts—likely has received an *increase* in publicity among a general audience since the Series aired.  (*See, e.g.*, *Id.*, Ex. 5 (Inna Lazareva, *Georgian women ruled chess in the Soviet era. A new generation chases the same 'Queen's Gambit' glory*, Washington Post, Dec. 13, 2020).)

Even if Plaintiff could allege economic damages (which she has not and cannot), she has no basis for claiming that the publication of the Line was the proximate cause of any such alleged losses.  The Line only referred to Plaintiff's co-ed competition results *as of 1968* and did nothing to call into question the many accomplishments Plaintiff achieved after that year—which is when she acknowledges her career reached its height:

> Q: "What was your best tournament in your life?"
> Plaintiff: "The 1977 Lone Pine, where I shared the 1st-4th place in a very strong open. . . . My best years were 1977 and 1978 including the above mentioned tournament."

(*See Id.*, Ex. 3 at 30; *id.*, Ex. 2 at 46:11–47:00 (Plaintiff describing Lone Pine as "the unofficial US Open Championship," which "was just by invitation and I was the only woman player.")).  The Line's assertion, made as of a moment in history, has no bearing on the public's view of Plaintiff's accomplishments as of today.

Finally, construed as a claim for defamation *per quod*, Plaintiff's claim should also be stricken or dismissed for failure to allege the extrinsic facts that a reasonable

viewer would need to infer the Line's alleged implication that Plaintiff did not face men because she was inferior.  *See Bartholomew v. YouTube, LLC*, 17 Cal.App.5th 1217, 1232 (2017) ("In pleading a case of libel *per quod* the plaintiff cannot assume that the court has access to the reader's special knowledge of extrinsic facts but must specially plead and prove those facts.") (internal quotation omitted).

### 4.   The Gist of the Line is Substantially True.

Even if it were reasonable for a viewer to interpret the Line as conveying an objective statement of fact (which it is not), the Line is substantially true and therefore protected under the First Amendment.  The substantial truth defense protects allegedly defamatory speech where "the imputation is substantially true so as to justify the 'gist or sting' of the remark"—even if there is "slight inaccuracy in the details." *Heller*, 2016 WL 6583048, at *4 (citing *Summit Bank v. Rogers*, 206 Cal.App.4th 669, 697 (2012)). An allegedly defamatory statement "is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson*, 501 U.S. at 516-17.

The substantial truth defense bars Plaintiff's claims as a matter of law based on the Series and the allegations in the FAC.  Plaintiff alleges that Netflix defamed her by having the fictional chess announcer state that she "never faced men" as of 1968, whereas Plaintiff allegedly "competed against and frequently defeated male chess players" starting in 1962-63.  (FAC ¶¶ 18, 21.)  Plaintiff's allegations, however, do not undermine the substantial truth of the Line.  The Line occurs in the Series finale at the fictional Moscow Invitational of 1968, depicted as one of the Soviet Union's most elite chess tournaments.  It explains why male Soviet players like Harmon's opponent likely failed to "spend a lot of time preparing for their match" against Harmon: They were accustomed to competing in male-dominated tournaments in the Soviet Union and lacked competition experience against elite female players.  (*Id.* ¶ 5.)  A reasonable viewer would have interpreted the Line in context to refer to Plaintiff's never facing male players at significant tournaments in the Soviet Union before 1968.

1    The announcer's assertion is substantially true.  Plaintiff does not allege that she

2    competed in high-level tournaments or exhibitions against men within the Soviet Union

3    before 1968.  (*See generally* FAC.)  And even if the Line were interpreted more broadly

4    to mean that Plaintiff never competed against men before 1968 in *any* substantial chess

5    tournament, the substantial truth defense would still apply.  Plaintiff's most notable

6    international chess competitions against men took place after 1968, including her

7    achieving a tie for second place at Sandomierz in 1976; a tie for first place at Lone Pine

8    in 1977; and a tie for second place at Dortmund in 1978.  (FAC ¶ 25.)  Indeed, Plaintiff

9    became the first woman to be awarded the title of "Grandmaster" in 1978 as a result of

10   her 1977 Lone Pine performance.  (*Id.* ¶ 28.)

11   Although Plaintiff identifies pre-1968 chess competitions in which she faced men

12   (*see* FAC ¶¶ 21–23), those allegations do not undermine Netflix's substantial truth

13   defense.  "[T]he law does not require [defendants like Netflix] to justify the literal truth

14   of every word of the allegedly defamatory content."  *Summit Bank*, 206  Cal.App.4th at

15   697.  Rather, "[i]t is sufficient if the defendant proves true the substance of the charge,

16   irrespective of slight inaccuracy in the details."  *Id.* (internal quotation marks omitted).

17   Netflix has done so here.  On the most generous reading of Plaintiff's FAC, the worst

18   that can be said is that Netflix erred by a matter of five years because Plaintiff alleges

19   that she first played tournaments against men in 1963.  (FAC ¶ 18.)  Such an inadvertent

20   factual discrepancy does not undermine the substantial truth of the Line.  *Cf. Vogel*, 127

21   Cal.App.4th at 1021-22 (claim that a candidate for public office owed his wife and

22   children "thousands" was substantially true, where the candidate only denied owing the

23   specific amount and therefore left open the possibility of owing a "substantially

24   equivalent" amount); *Braun v. Chronicle Publ'g Co.*, 52 Cal.App.4th 1036, 1050 n.6

25   (1997) (report that the district attorney opened a criminal probe was substantially true

26   even though  the state auditor that initiated the investigation, given that the "sting" was

27   the existence of the investigation itself); *Guccione v. Hustler Magazine, Inc.*, 800 F.2d

28   298, 302 (2d Cir. 1986) (cited approvingly by *Hughes v. Hughes*, 122 Cal.App.4th 931

(2004)) (the substantial truth defense protected a magazine article published in 1983 describing a public figure as being "married [with] a live-in girlfriend" because the man had in fact been married with a live-in girlfriend from 1966 to 1979). The Line cannot be the basis for a successful defamation claim for that reason.[5]

### 5. Plaintiff Cannot Prove Actual Malice by Clear and Convincing Evidence.

Finally, Plaintiff cannot prove actual malice. As a public figure (FAC ¶¶ 71, 79), Plaintiff must prove actual malice by clear and convincing evidence, which requires "that the evidence of actual knowledge of the falsity or reckless disregard for its falsity must be of such character as to command the unhesitating assent of every reasonable mind." *McGarry*, 154 Cal.App.4th at 114 (internal quotation marks omitted). The test is a subjective one "under which the defendant's actual belief concerning the truthfulness of the publication is the crucial issue." *Id.* Negligence is not enough: "[T]he evidence must permit the conclusion that the defendant actually had a high degree of awareness of probable falsity." *Id.* (cleaned up).

Plaintiff cannot satisfy this standard. The Series' creator consulted with two leading chess experts to ensure the accuracy of the Series' depiction of chess tournaments and historical references. (Frank Decl., ¶ 19.) The consultants reviewed the scripts for the Series and returned notes flagging recommended changes or other

---

[5] Plaintiff also argues that Netflix allegedly "[p]il[ed] on additional insult to injury" by "describ[ing] Gaprindashvili as Russian, despite knowing that she was Georgian." (FAC ¶ 10.) That is wrong. The commentator does not claim that Plaintiff is Russian but rather states that female chess players like Plaintiff are "not unique in Russia." (*Id.* ¶ 5.) In context, a reasonable viewer would have understood the reference to "Russia" to mean the former Soviet Union—a usage that was consistent with the way that the Series' creator understood Americans to refer to the Soviet Union during the 1960s. (Frank Decl., ¶ 16.) Claiming that Plaintiff would have been well-known in Russia (*i.e.*, the Soviet Union) is historically accurate, given that Plaintiff competed on behalf of the Soviet Union for decades. (*See* Johnson Decl., Ex. 4 (Sammy Reshevsky, *The Art of Positional Play*, Chess Life & Review 217 (April 1977)) ("The leading Soviet woman player, Nona Gaprindashvili, has proved to be a strong competitor even among men.").

issues.  (*Id.* ¶ 20.)  Neither expressed any reservation to the Series' author about the accuracy of the Line.  (*Id.*)  Indeed, it was consistent with the understanding that 1960s chess in the Soviet Union was largely gender-segregated, leading great female chess players, like Plaintiff, to focus on competing in female world championships rather than in other elite tournaments dominated by men.  (*Id.* ¶ 21.)  For example, *Glory to the Queen*, a March 2020 documentary featuring Plaintiff and three other elite Georgian female chess players, refers to the subjects' co-ed tournaments in the 1970s and later, but as to the 1960s, only references female-only tournaments.  (Johnson Decl., ¶ 3; *see also id.*, Ex. 2 at Preface (author characterizing Plaintiff as "the female player who dominated women's chess during almost all of the sixties and seventies"); *id.*, Ex. 2 at 51:35–51:58 (documentary stating that the 1986 match between grandmaster Petar Popovic and "world's best woman player" Maia Chiburdanidze, was "only the second time in chess history that such a high-level battle between the sexes had taken place.").

Plaintiff's actual malice argument is especially futile because the alleged defamation claim arises out of a work of fiction (the Series)—based on another work of fiction (the novel)—that is "by definition untrue": "It is imagined, made-up," or "[p]ut more starkly, it is false." *De Havilland*, 21 Cal.App.5th at 869.  Succeeding in showing actual malice would require proving that Netflix acted "in the hope of insinuating a defamatory import," meaning that it "knew or acted in reckless disregard of whether its words would be interpreted by the average reader as defamatory statements of fact." *Id.* at 870 (citing *Good Gov't Grp. Of Seal Beach, Inc. v. Super. Ct. of L.A. Cnty.*, 22 Cal.3d 672, 684 (1978)).  But as described above, Plaintiff cannot satisfy that standard.  Not only did the Series' creator include the Line to highlight that the Soviet Union faced sexism and structural barriers to the advancement of women in chess comparable to those that the American protagonist Harmon faced; he also removed negative commentary included in the novel about how Plaintiff was "not up to the level of" the fictional tournament even though she had "met" the Russian Grandmasters before, and expressly added that Plaintiff was the female world champion.  (Frank Decl., ¶ 18.)

Those changes reflected an intent of recognizing Plaintiff's elite status as one of the Soviet Union's preeminent chess players and its most accomplished female player—a far cry from acting with reckless disregard as to the falsity of the Line.[6] (*Id.*)

Because the creator consulted with multiple chess experts and relied in good faith on their advice before Netflix released the Series, Plaintiff cannot show by clear and convincing evidence that Netflix acted with actual malice. *See McGarry*, 154 Cal.App.4th at 114 (a defendant's failure to investigate a claim entirely is not sufficient to establish actual malice unless the plaintiff can show that the defendant "purposefully avoided the truth or deliberately decided not to acquire knowledge of facts that might confirm the probable falsity of charges"); *Annette F. v. Sharon S.*, 119 Cal.App.4th 1146, 1169 (2004) ("[M]ere failure to investigate the truthfulness of a statement, even when a reasonably prudent person would have done so, is insufficient.").

## IV.   ALTERNATIVELY, THE FAC SHOULD BE DISMISSED WITH PREJUDICE FOR FAILURE TO STATE A CLAIM FOR RELIEF UNDER RULE 12(b)(6)

For the reasons set forth in Sections III.B.1, III.B.2, III.B.3, and III.B.4 above—none of which relies on evidence extrinsic to the FAC and Series—Plaintiff also fails to plausibly allege a claim for relief under Rule 12(b)(6). Because no amendment would cure the legal deficiencies in Plaintiff's claims, which she has already amended once, the FAC should be dismissed without leave to amend. *See Dougherty*, 654 F.3d at 901.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's FAC should be stricken pursuant to the anti-SLAPP statute or, alternatively, dismissed with prejudice under Rule 12(b)(6).

---

[6] Plaintiff's actual malice argument is predicated on her belief that Netflix should have immediately understood the novel's reference to Plaintiff having "met" Russian Grandmasters as a factual statement that she competed against them by 1968. Plaintiff ignores that the novel *itself* was a work of fiction, and that Netflix hired experts to verify that the references to real life chess players in the Series were accurate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: November 1, 2021

By: */s/ Arwen R. Johnson*
ARWEN R. JOHNSON (SBN 247583)
 *arwen.johnson@kslaw.com*
KELLY PERIGOE (SBN 268872)
 *kperigoe@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendant NETFLIX, INC.

26