1 | RUFUS-ISAACS ACLAND & GRANTHAM LLP
ALEXANDER RUFUS-ISAACS, State Bar No. 135747
2 |   *aisaacs@rufuslaw.com*
9420 Wilshire Blvd., 2nd Floor
3 | Beverly Hills, California 90212
Telephone: (310) 770-1307
4 | Facsimile: (424) 258-7383

5 | RODNEY A. SMOLLA
  *rodsmolla@gmail.com*
6 | 4601 Concord Pike
Wilmington, Delaware 19803
7 | Telephone: (864) 373-3882
(Admitted Pro Hac Vice)

8 |

9 | Attorneys for plaintiff NONA
GAPRINDASHVILI

10 |

11 | **UNITED STATES DISTRICT COURT**

12 | **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

13 |

14 | NONA GAPRINDASHVILI, an individual,

15 |                   Plaintiff,

16 | v.

17 | NETFLIX, INC., a Delaware corporation, and DOES 1-50,

18 |

19 |                   Defendants.

CASE No. 2:21-cv-07408 VAP (SKx)

**PLAINTIFF'S OPPOSITION TO SPECIAL MOTION TO STRIKE FIRST AMENDED COMPLAINT**

Date:    January 24, 2022
Time:    2:00 pm
Dept.:   8A

*(margin)* RUFUS–ISAACS ACLAND & GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA 90212
Tel (310) 770-1307 – Fax (310) 860-2430

8658.1.6.

1

2

3

4

5

6

7

8

9

10

11

RUFUS-ISAACS ACLAND & GRANTHAM LLP

9420 WILSHIRE BLVD., 2ND FLOOR

BEVERLY HILLS, CALIFORNIA, 90212

Tel (310) 770-1307 – Fax (310) 860-2430

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **<u>TABLE OF CONTENTS</u>**

**Page**

I.    SUMMARY OF PLAINTIFF'S ACHIEVEMENTS .......................................1

II.   SCOTT FRANK'S TESTIMONY SHOWS KNOWLEDGE OF FALSITY AND/OR A RECKLESS DISREGARD FOR THE TRUTH .........2

   A.   Frank's Use Of "Largely" Can Only Mean That He Knew That Plaintiff Played Against Male Grandmasters Before The 1970's ..........3

   B.   Frank Knew About Plaintiff's Career Before He Wrote The Line........3

   C.   Frank Claims That He Changed The Line To Show Gender Segregation But He Did Not Convey That Meaning To The Viewer ..........................................................................................................4

   D.   Frank Contradicted Himself During His Deposition About When He Learned That Plaintiff Was A Real Person .......................................5

III.  PLAINTIFF HAS A MINIMAL BURDEN UNDER SECOND PRONG........................................................................................................5

IV.   ACTIONABLE FALSE LIGHT AND DEFAMATION CLAIMS MAY ARISE FROM FICTIONAL WORKS ........................................6

   A.   False Light and Defamation May Arise in Fiction ................................6

   B.   Fleeting And Self-Serving Disclaimers Are Not Immunizing ..............7

   C.   Decisions Cited by Netflix Do Not Undermine Plaintiff's Claims ........8

V.    THE LINE IS HIGHLY OFFENSIVE AND DEFAMATORY ....................10

   A.   Reasonable Viewer Could View Line As Offensive and Defamatory................................................................................................10

   B.   Actual Viewers Understood the Line as Offensive and Defamatory................................................................................................12

VI.   THE LINE IS PROVABLY FALSE AND THEREFORE NOT OPINION...................................................................................................13

VII.  THE LINE IS DEFAMATION PER SE .......................................................14

   A.   The Line is Slander Per Se Pursuant To Cal. Civ. Code § 46 ..............14

   B.   Accusation That Plaintiff Was Not Up To Competing With Men Is Defamatory On Its Face .......................................................................15

   C.   Plaintiff Did Plead Special Damages....................................................17

VIII.   THE LINE IS NOT SUBSTANTIALLY TRUE ............................................ 18

IX.   PLAINTIFF HAS SATISFIED THE ACTUAL MALICE STANDARD ..... 19

    A.   Plaintiff Has Shown A Prima Facie Case That Netflix Knew That The Line Was False Because She Had Played Men in/Before 1968 ........................................................................................... 19

    B.   Actual Malice Can Be Shown For Statements In Fictional Works ...... 20

    C.   Actual Malice May Be Shown By Any Competent Evidence .............. 20

    D.   Defendant Who Researches An Issue Is Charged With Knowledge ...................................................................................... 22

    E.   Netflix Researched Plaintiff's Career And Must Have Discovered That Plaintiff Had Played Men Before 1968 ...................... 24

    F.   Kasparov Must Have Known That Plaintiff Had Played Men ............. 25

X.   CONCLUSION ............................................................................................ 25

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 • Fax (310) 860-2430

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Eastwood v. National Enquirer, Inc.*, 123 F.3d 1249 (9th Cir. 1997)......................21

*Guam Federation of Teachers, Local 1581, of Am. Federation of Teachers v. Ysrael*, 492 F.2d 438 (9th Cir. 1974)..................................................21

*Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, (1989) ..........23

*Herbert v. Lando*, 441 U.S. 153 (1979).....................................................21

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) .........................................21

*Masson v. New Yorker Magazine, Inc*., 960 F.2d 896 (9th Cir. 1992)...............22, 23

*Masson v. New Yorker Magazine., Inc,* 501 U.S. 496 (1991) ..........................6, 18

*Metabolife International, Inc. v. Wornick*, 264 F.3d 832 (9th Cir.2001) ...................6

*Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990)......................................13

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995)....................................13

*Peck v. Tribune Co.*, 213 U.S. 185 (1909)...............................................15

*Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016).........................................9

*St. Amant v. Thompson,* 390 U.S. 727 (1968) ...........................................20

*Stanton v. Metro Corp.,* 438 F.3d 119 (1st Cir. 2006) ...................................8

*Tah v. Global Witness Publishing, Inc.,* 413 F.Supp.3d 1 (D.D.C. 2019), a*ff'd,* 991 F.3d 231 (D.C. Cir. 2021), *cert. denied,* 2021 WL 5043599 (Nov. 1, 2021)...............................................................................12

*Vasquez v. Whole Foods Market, Inc*., 302 F.Supp.3d 36 (D.D.C. 2018) ...............12

*Wehling v. Columbia Broadcasting System* 721 F.2d 506 (1983)............................18

## STATE CASES

*Antonovich v. Superior Court*, 234 Cal.App.3d 1041 (1991)...................................22

*Arno v. Stewart*, 245 Cal.App.2d 955 (1966) ............................................14

*Balla v. Hall,* 59 Cal.App.5th 652 (2021) ...........................................16, 22

*Barnes-Hind, Inc. v. Superior Court,* 181 Cal.App.3d 377 (1986)............................16

RUFUS-ISAACS ACLAND & GRANTHAM LLP

9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 – Fax (310) 860-2430

*Bindrim v. Mitchell*, 92 Cal.App.3d 61, *cert. denied*, 444 U.S. 984 (1979).......... 7, 20

*Burnett v. National Enquirer, Inc.,* 144 Cal.App.3d 991 (1983)............................... 21

*City of Montebello v. Vasquez*, 1 Cal.5th 409 (2016)................................................ 5

*Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860 (1979)........................ 9

*Law Offices of Herbert Hafif*, 39 Cal.4th 260 (2006)................................................ 6

*MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536 (1959) .............................. 15, 17

*McGarry v. Univ. of San Diego*, 154 Cal.App.4th 97 (2007) .................................. 22

*Navellier v. Sletten,* 29 Cal.4th 82 (2002) ................................................................ 5

*Oasis W. Realty, LLC v. Goldman*, 51 Cal.4th 811 (2011) ...................................... 6

on *De Havilland v. FX Networks, LLC,* 21 Cal.App.5th 845 (2018) ........................ 8

*Washburn v. Wright*, 261 Cal.App.2d 789 (1968)..................................................... 6


**OUT OF STATE CASES**

*New Times, Inc. v. Isaacks,* 146 S.W.3d 144 (Tex. 2004)......................................... 8


**FEDERAL STATUTES**

F.R.E. 604 ................................................................................................................... 1

F.R.E. 901 ................................................................................................................... 1


**STATE STATUTES**

Cal. Civ. Code § 46(3) .............................................................................................. 14

Cal. Civ. Code § 46(5) .............................................................................................. 14


**TREATISES**

Robert Sack, *Libel, Slander, and Related Problems* 138 (1980) .............................. 18

Rodney Smolla, *Law of Defamation* § 5.08 (1991).................................................. 18

RUFUS–ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA 90212
Tel (310) 770-1307 – Fax (310) 860-2430

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 – Fax (310) 860-2430

# I.     <u>SUMMARY OF PLAINTIFF'S ACHIEVEMENTS</u>

Plaintiff Nona Gaprindashvili was born in the Georgian Soviet Socialist Republic ("Georgia") in 1941 and began playing chess professionally aged 13. In 1962, aged 21, she became female World Champion and kept her crown until 1978. [Nona Gaprindashvili Declaration[1] ("NG Decl."), ¶2.]

One of her first tournaments against men was the Men's Championship of Georgia in 1959. [Id., ¶8(a).] In 1963, she finished in 6th place in the same tournament. Her opponents included Alexander Blaghidze, the Georgian Men's Champion, who held the title of "Soviet Master of Sports." [Id., ¶8(b).]

Plaintiff began to compete against male chess players internationally in 1963 when she won the Challengers Section of the Hastings International Chess Congress in England in 1963, defeating several male players. In 1964-65, she played in the Premier Section of that tournament against male opponents including legendary Grandmasters Svetozar Gligoric (12-time champion of Yugoslavia) and Paul Keres (3-time Soviet champion). She drew with Keres. [Id., ¶6.] At another tournament in England in 1965, she simultaneously played 28 men, beating 20 of them. [Id., ¶7.]

In 1964, she played in a tournament in Iceland against 13 male chess players, including Gligoric, Fridrik Ólafsson (6-time Iceland champion), and World

---

[1] Plaintiff does not speak English. Her original declaration in Russian bearing her signature is filed concurrently herewith, along with a translation into English by a professional translator and a certificate of accurate translation, per FRE 604, 901. [See Declaration of Alexander Rufus-Isaacs ("ARI Decl."), ¶2.]

1   Champion Mikhail Tal (Latvian Soviet Socialist Republic), winning 3 games. [Id.,

2   ¶8(c).] The same year, she finished in 9th place in the Men's Championship of

3   Georgia. In 1966, she was the only female participant in the Championship of the

4   Soviet Socialist Republics of the Caucasus, and played 5 leading male Soviet chess

5   players. In 1968, she played in a tournament held in Sweden against 9 men. The

6   same year, she played against numerous Soviet male players in the Championship of

7   the Baltic Socialist Republics and the Vakhtang Karseladze Memorial Tournament,

8   including several Grandmasters. [See ¶8(d)-(h) for details of her male opponents.]

9       During her career, Plaintiff played other Grandmasters including Dragoljub

10  Velimirovich, Rudolf Servaty, Bojan Kurajica, Anatoly Lein, and Boris Spassky

11  who was World Champion. [Id., ¶12.] In 1978, she was the first woman to be made

12  an International Chess Grandmaster among men. [Id., ¶5.] She is now aged 80, and

13  still competes in senior chess tournaments. [Id., ¶18.]

14      All of this information is publicly available and can easily be found on chess

15  websites and reference books about chess. [Id., ¶17; Carlin Decl., ¶¶9-12.]

16  **II.    SCOTT FRANK'S TESTIMONY SHOWS KNOWLEDGE OF
        FALSITY AND/OR A RECKLESS DISREGARD FOR THE TRUTH**

17      The Novel states that Plaintiff "had met all these Russian Grandmasters many

18  times before." Despite following the Novel closely in other respects, Scott Frank,

19  who wrote the screenplay of the Series ("Screenplay"), reversed this fact, writing

20  that she "had never faced men" (the "Line"). His declaration is dated October 28,

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 – Fax (310) 860-2430

2021 ("Frank Decl.") (Docket 21-7). He was deposed on November 12, 2021.[2] His declaration and deposition testimony establish that he knew that the Line was false, or, alternatively, that he showed a reckless disregard for the truth.

## A.   Frank's Use Of "Largely" Can Only Mean That He Knew That Plaintiff Played Against Male Grandmasters Before The 1970's

Frank's Declaration at ¶21 states that ""[b]ased on the research that my team completed, … (Plaintiff's) participation in notable tournaments against male grandmasters **largely** occurred in the 1970s and later." (Emphasis added.) The only reason for Frank to add the qualifier "**largely**" was to indicate that this research had revealed that Plaintiff had participated in **some** "notable tournaments against male grandmasters" **before** the 1970's. In deposition, Frank could not explain why he had used "largely," even though his declaration was dated only 2 weeks before the deposition. [Transcript of Scott Frank's deposition ("Transcript"), 33:25-34:24.]

## B.   Frank Knew About Plaintiff's Career Before He Wrote The Line

In his declaration, Frank states that "[m]y team and I spent many hours researching chess and consulting with chess advisors in developing the screenplay." Those advisors were Bruce Pandolfini and Garry Kasparov, "a former world champion and expert in Soviet chess during the relevant era."  [Frank Decl., ¶19.]

Frank also states in his declaration, "[b]ased on the research that my team

---

[2] The transcript will be lodged with the court in accordance with L.R. 16.2-7 and 32.1.

completed, Ms. Gaprindashvili was the female world champion in the 1960s..." [Id., ¶21.] This explains how he learned that she was "female world champion," a fact which he added to the Screenplay (it was not in the Novel) immediately before the Line.[3] [Id, ¶¶12, 17; Transcript, 36:15-37:1.] Further evidence that Frank knew about Plaintiff's career before he wrote the Screenplay is the statement in his declaration that he referred to her by name therein "to recognize her status as one of the then Soviet Union's great chess players." [Frank Decl., ¶15.] And he admitted in deposition that when he wrote the Screenplay, he knew that she was female world champion and one of the Soviet Union's great chess players. [Transcript, 51:7-20.]

These facts conclusively establish that Frank was familiar with Plaintiff's career when he wrote the Screenplay. Nevertheless, he changed the correct statement in the Novel that Plaintiff "had met all these Russian Grandmasters many times before," to the false statement that she "never faced men." He admits that he had no basis for making this change. [Id., 38:18-22.]

C.   **Frank Claims That He Changed The Line To Show Gender Segregation But He Did Not Convey That Meaning To The Viewer**

Frank claims that the Line "was intended to indicate to the viewer that the Soviet chess world of 1968 was gender-segregated, such that major tournaments were separated by sex." [Id., ¶14.] But he conceded in deposition that he did not

---

[3] The whole sentence in the Screenplay reads, "There's Nona Gaprindashvili, but she's the female world champion and has never faced men." [Id, ¶12.]

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 — Fax (310) 860-2430

include any statements in the Screenplay that would lead a viewer to understand that gender segregation was the reason why Plaintiff never faced men. [Transcript, 44:4-9.] Without such words, no one could discern this meaning. This omission strongly suggests that his professed intent was fabricated after the fact.

**D.** **Frank Contradicted Himself During His Deposition About When He Learned That Plaintiff Was A Real Person**

In deposition, Frank contradicted himself about an important fact. Initially, he said that he did not know that Plaintiff was a real person until he was told during production in late 2019. [Id., 25:7-17; 29:10-30:11; 35:17-36:1; 36:6-12.] But when confronted with the facts summarized in Section II(B) above, he agreed that he knew in June 2019 when he wrote the Screenplay that Plaintiff was a real person and a female world champion. [Id., 51:7-20.]. Clearly his testimony that he did not find out that Plaintiff was a real person until later in 2019 is false.

**III.** **PLAINTIFF HAS A MINIMAL BURDEN UNDER SECOND PRONG**

Plaintiff does not contest prong one of the California anti-SLAPP law analysis. Thus, the entire case turns on prong two. All that she is required to do under this prong is to demonstrate that factually and legally her allegations present "minimal merit." *Navellier v. Sletten,* 29 Cal.4th 82, 93 (2002). To satisfy this standard, "[t]he plaintiff need only state and substantiate a legally sufficient claim." *City of Montebello v. Vasquez*, 1 Cal.5th 409, 420 (2016). The Court is not permitted to weigh one submission against the other, comparing the relative strength

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 – Fax (310) 860-2430

1  or credibility of Plaintiff's submissions against the submissions of Netflix. *Soukup v.*

2  *Law Offices of Herbert Hafif*, 39 Cal.4th 260, 291 (2006). Dismissal is permitted

3  only when "no reasonable jury" could find in a plaintiff's favor. *Metabolife*

4  *International, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir.2001). The obligation of

5  the Court is to "accept as true" any evidence favorable to Plaintiff. *Oasis W. Realty,*

6  *LLC v. Goldman*, 51 Cal.4th 811, 820 (2011).

## IV.   ACTIONABLE FALSE LIGHT AND DEFAMATION CLAIMS MAY ARISE FROM FICTIONAL WORKS

### A.   False Light and Defamation May Arise in Fiction

Netflix broadly asserts that it is immune from liability because the Series is a work of fiction, based on the Novel that is also fiction. [Netflix Mem. at pp. 12-15.] This is incorrect - fictional works are not defamation free-fire zones, and a false statement of fact targeting a real person may give rise to an actionable false light or defamation claim even though the statement is embedded in a fictional work.

In this case, the actionable statement resides in just once sentence. Yet as the Supreme Court recognized in *Masson v. New Yorker Magazine., Inc.,* 501 U.S. 496 (1991), "[i]t matters not under California law that petitioner alleges only part of the work at issue to be false." Id. at 510. "'[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text." Id., quoting *Washburn v. Wright*, 261 Cal.App.2d 789, 795 (1968).

The most significant California decision on the issue is *Bindrim v. Mitchell*,

RUFUS-ISAACS ACLAND & GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA 90212
Tel (310) 770-1307 ~ Fax (310) 860-2430

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 ~ Fax (310) 860-2430

92 Cal. App. 3d 61, *cert. denied*, 444 U.S. 984 (1979), where Dr. Paul Bindrim, a therapist who held nude encounter therapy sessions, sued Gwen David Mitchell, a novelist, for depicting him as a character in her novel entitled *Touching* called "Dr. Simon Herford" who misbehaves during such a session. *Id. at 70.* The court held that "[t]he fact that '*Touching'* was a novel does not necessarily insulate Mitchell from liability for libel, if all the elements of libel are otherwise present." *Id. at 71, n. 2.* No one test applies, the court reasoned. "Each case must stand on its own facts." *Id. at 78.* It rejected Mitchell's main line of defense, which was that Herford was not "of and concerning" Bindrim, concluding that they were one. *Id. at 76.*

Typically, false light or defamation cases arising from fictional works turn on whether a fictional character would be understood as referring to the real-person plaintiff, thus implicating the requirement that the statement be "of and concerning" the plaintiff. But the identification issue is not in play here. Netflix cannot dispute that Plaintiff was identified by name and that the identification was intentional.

### B.   Fleeting And Self-Serving Disclaimers Are Not Immunizing

Netflix attempts to buttress its sweeping "fiction defense" by pointing to a fleeting disclaimer run by Netflix for a few seconds in credits for each episode, reciting: "[T]he characters and events depicted in this program are fictitious. No depiction of actual persons or events is intended." [Netflix Mem. at p. 6.]

Such disclaimers do not immunize a fictional work from liability if a court finds that a jury could reasonably conclude that contrary to the self-serving

disclaimer, the work did contain a false statement of fact intended to reference a real person. In *Stanton v. Metro Corp.,* 438 F.3d 119, 124 (1st Cir. 2006), the First Circuit reversed a finding that a similar disclaimer was dispositive. It noted the placement of the disclaimer, observing that it was "easy enough to overlook." *Id. at 126.* The court held that "we cannot say as a matter of law that too few readers would overlook the disclaimer to constitute a considerable and respectable segment of the community" and that notwithstanding the disclaimer the publication was "reasonably susceptible to a defamatory meaning." *Id. at 128.*

The existence of a disclaimer is thus but one factor in the analysis. Here, the power of the disclaimer pales when measured against the use of Plaintiff's actual name and false description of her as a chess master who had never played men. See, e.g., *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 160–61 (Tex. 2004)  ("while a disclaimer would have aided the reasonable reader . . . such a disclaimer is not necessarily dispositive.")

## C.     Decisions Cited by Netflix Do Not Undermine Plaintiff's Claims

Netflix places extensive reliance on *De Havilland v. FX Networks, LLC,* 21 Cal.App.5th 845 (2018), misleadingly invoking it for the broad proposition that "[t]elevision shows often portray real people, but such people 'do [] not own history" or "have the legal right to control, dictate, approve, disapprove, or veto the creator's portrayal of actual people.'" [Netflix Mem. at p. 2, quoting *De Havilland*, 21 Cal.App.5th at 849–50.] Nothing in *De Havilland*, however, undermines

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA 90212
Tel (310) 770-1307 ~ Fax (310) 860-2430

1    Plaintiff's claim. Many of the quotations Netflix lifts from *De Havilland* are not

2    germane to false light or defamation, but rather to the principal claim advanced by

3    Olivia de Havilland that the FX Network was not permitted to broadcast a

4    docudrama featuring her without her permission because such appropriation of her

5    life and persona constituted a violation of her right of publicity. The court rejected

6    this view, holding that the portrayal of a real person in a film was not the sort of

7    appropriation cognizable under the California right of publicity or the free speech

8    protections of the First Amendment. In this respect *De Havilland* was of a piece

9    with *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal.3d 860 (1979), and *Sarver

10   v. Chartier*, 813 F.3d 891 (9th Cir. 2016), both cited by Netflix, which rejected right

11   of publicity claims grounded in portrayals of real persons in fictional works.

12           Nothing in cases such as *De Havilland*, *Guglielmi*, or *Sarver*, however,

13   forecloses false light or defamation claims arising from the portrayal of real persons

14   in fictional works. To the contrary, decisions such as *De Havilland* and *Sarver* (the

15   issue was not posed in *Guglielmi*) accepted that viable false light or defamation

16   claims could arise from portrayals of real persons in fictional films. *De Havilland*

17   and *Sarver* then proceeded to analyze the portrayals in the two movies under

18   principles of false light or defamation, concluding on the specific facts presented the

19   portrayals were not actionable. The key to *De Havilland* was that the alleged falsity

20   was too trivial to be actionable. The movie portrayed de Havilland as using the word

21   "bitch" on two occasions in reference to Joan Fontaine, when in fact the word she

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 ~ Fax (310) 860-2430

1    used was "Dragon Lady."  In *Sarver* the court held that the depiction of plaintiff's

2    military career was laudatory, not defamatory, and not by any measure offensive.

3        In summary, the law does not provide any blanket immunity for Netflix for

4    otherwise actionable false light or defamation claims by Plaintiff arising from the

5    Series merely because the work is generally fictional. What matters is not that the

6    Series is fictional, but that the statement concerning Plaintiff is actionable.

7

8

9    **V.**    **THE LINE IS HIGHLY OFFENSIVE AND DEFAMATORY**

10        **A.**    **Reasonable Viewer Could View Line As Offensive and Defamatory**

11        Netflix trivializes and belittles Plaintiff's suit by stating: "Plaintiff alleges the

12   Line is inaccurate by a few years and therefore false, defamatory, and highly

13   offensive to a reasonable person," and dismisses it as "a minor inaccuracy in

14   timing."  [Netflix Mem. at p. 1, 3.] It makes the argument that no reasonable viewer

15   would understand the false statements impugning Plaintiff for having never played

16   against men as a sexist imputation that she was inferior to men. No reasonable

17   viewer would draw this conclusion, Netflix argues, because a major theme of the

18   Series is the triumph of its fictional character over male chess players. [Id.. at p. 15.]

19        Netflix has it entirely upside down. Netflix was not merely telling a story of a

20   woman beating men in chess, it was telling a story of an *American* woman beating

21   Russian men at chess. Yes, Netflix *did* elevate its fictional character Beth Harmon

22   as a woman-beats-men story. Yet to heighten the drama, as Netflix *admits*, it found

23   it convenient to deliberately tell a falsehood about a real-world Georgian woman

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 ~ Fax (310) 860-2430

who had in *fact* faced men and beaten them. Netflix is here hoisting itself on its own petard. Netflix is *admitting* that it was elevating Harmon as an American hero who overcame sexism to compete successfully against men. But highlighting Harmon as a hero who triumphed over men does not *diminish* the sting of the falsehood Netflix uttered in exploiting and disparaging the accomplishments of Plaintiff, but *heightens* it. The message (that Harmon could do it, but Plaintiff had not) in no way dilutes the sting of the lie, it exacerbates it.

The notion that this falsehood could not, as a matter of law, ever be highly offensive to a reasonable person—the standard for false light—or diminish the esteem with which Plaintiff is regarded—the standard for defamation, is ludicrous. It distills to an assertion that when a woman is compared to a man in her skills, abilities, or accomplishments through the statement that she "has never faced men" *no reasonable person* would construe this as conveying the meaning that *she is not good enough because, after all, she never faced men*.

The position taken by Netflix defies common sense, the common law, and our constitutional values. *Of course*, such a statement partakes of sexual stereotypes. *Of course*, such a statement carries the stigma that women bear a badge of inferiority. What else is conveyed by "she has never faced men" other than "she is not as good as men?"

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel. (310) 770-1307 – Fax (310) 860-2430

PLAINTIFF'S OPPOSITION TO SPECIAL MOTION TO STRIKE FIRST AMENDED COMPLAINT

### B.   Actual Viewers Understood the Line as Offensive and Defamatory

Netflix tries to dismiss the citations in the Complaint to the many social and mass media reactions to the Line as defaming Plaintiff. [ARI Decl., Exhs, 4-11.] [Netflix Mem. p. 17, n. 4.] But the ultimate test for this Court is whether a *reasonable viewer could* interpret the Line as conveying a false fact that was highly offensive to a reasonable person or defamatory. Evidence that actual viewers *did* interpret the statements as offensive or defamatory is at least *probative* of whether reasonable viewers *could* so interpret the broadcast. *See, e.g., Tah v. Global Witness Publishing, Inc.,* 413 F. Supp. 3d 1, 11–12 (D.D.C. 2019), a*ff'd*, 991 F.3d 231 (D.C. Cir. 2021), *cert. denied*, 2021 WL 5043599 (Nov. 1, 2021) (treating evidence of how a statement was understood by recipients as germane to the question of whether the statement was capable of sustaining a defamatory meaning); *Vasquez v. Whole Foods Market, Inc.*, 302 F.Supp.3d 36, 64 (D.D.C. 2018) (a plaintiff can rely on evidence of how listeners understood statements to prove that they pertain to him.).

The standard, to be sure, remains objective. But in judging whether an ascribed meaning is *objectively* reasonable, the Court is entitled to consider how those in the real world actually construed the allegedly offending statement. That evidence is not offered as dispositive, but probative; it is not offered as controlling, but persuasive. The existence of those media and viewer interpretations, widespread and pointed as they were, *at the very least establishes that the issue of defamatory meaning is a jury question* that may not be decided on the pleadings.

**VI.**      **THE LINE IS PROVABLY FALSE AND THEREFORE NOT OPINION**

As Senator Daniel Patrick Moynihan famously noted, while everyone is entitled to his or her own opinion, they are not entitled to their own facts. The Novel states that Plaintiff "had met all these Russian Grandmasters many times before." [FAC ¶ 64.] That was a *true statement of fact*. Netflix deliberately reversed this, stating that Plaintiff "had never faced men." That was a *false statement of fact*.

The Supreme Court in *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990) made it clear that under the First Amendment, labels do not matter. What matters is substance. In *Milkovich*, the Court stated that the First Amendment does not "create a wholesale defamation exemption for anything *that might be labeled* 'opinion.'" *Id.* at 18 (emphasis added).

At the end of the day, the most important touchstone in separating fact from opinion is whether judges and juries  may subject a statement to objective proof or disproof. *Partington v. Bugliosi,* 56 F.3d 1147, 1158 (9th Cir. 1995). ("Thus, there is no reason that pre-*Milkovich* opinions which analyze whether a particular type of statement is susceptible to objective proof should be any less binding than before.")

Netflix seeks to obscure the plain import of its offending statement with smoke and mirrors. Yet whether Plaintiff had faced men or not faced men is an objective factual question. She either did or she did not, and even Frank conceded that if her Wikipedia page is accurate, the Line is false. [Id., 41:9-22.]

RUFUS-ISAACS ACLAND & GRANTHAM LLP

9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 • Fax (310) 860-2430

1

## VII.   THE LINE IS DEFAMATION PER SE

### A.   The Line is Slander Per Se Pursuant To Cal. Civ. Code § 46

Netflix's argument that the defamatory meaning conveyed by the Line is *per quod* and not *per se* is incorrect. Defamation in a television broadcast is treated in California as slander. *Arno v. Stewart*, 245 Cal.App.2d 955, 961 (1966). And the Line fits easily within two of the slander per se categories recognized by statute in California, in that it tends to injure Plaintiff her profession, Cal. Civ. Code § 46(3), and it falls within the catch-all provision of the statute, constituting defamation "[w]hich, by natural consequence, causes actual damage." Cal. Civ. Code § 46(5).

As she explains in her Declaration, Plaintiff's life-long profession is the world of competitive chess, in which she remains an active leader, role-model, and competitor. To degrade her by falsely stating that she did not face men was manifestly defamatory, cutting to the heart of her professional standing. It is no answer that she is 80 years old, any more than it would be an answer impugning the career of an 80-year-old doctor, lawyer, movie director, or actress.

Plaintiff's current participation in the chess world remains tied to her historical success and accomplishments. Her professional reputation and brand are inextricably bound up with her efforts to face and defeat top male opponents when chess was overwhelmingly a man's world.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 – Fax (310) 860-2430

### B.  <u>Accusation That Plaintiff Was Not Up To Competing With Men Is Defamatory On Its Face</u>

Netflix erroneously conflates the question of how many viewers *knew* who Plaintiff was in real-life, or how many viewers *knew* that the Line was false, with whether the Line would be understood by the average viewer as imputing that Plaintiff has never faced men, and in turn that she was not up to facing men.

Netflix's rendition of the law is entirely in error. It is not the law that, for the Line that Plaintiff had never faced men to be defamatory, a viewer must know about the world of chess in 1968. All that is required is that the viewer *could* understand that someone who is labeled as not having faced men was not up to competing against men. *That* meaning is defamatory on its face. No extrinsic facts are required to understand the defamatory import of *that* imputation. In the words of Justice Oliver Wendell Holmes, defamation liability attaches if the statement "obviously would hurt the plaintiff in the estimation of an important and respectable part of the community," because "liability is not a question of a majority vote." *Peck v. Tribune Co.*, 213 U.S. 185, 189-90 (1909).

This critical distinction is best illustrated by Justice Traynor's elaborate discussion in *MacLeod v. Tribune Publishing Co.,* 52 Cal.2d 536, 549 (1959), one of the landmark decisions defining the contours of California defamation law. The alleged defamation in *MacLeod* was that the plaintiff, a political candidate, was a communist sympathizer. Id. at 543. Justice Traynor's opinion for the Court held that

1    it did not matter that some would deem the publication innocent, while other might

2    deem it negative, for this inquiry was not the same as whether the *meaning* of the

3    words from which the allegedly negative meaning arose was clear on the face of the

4    publication, because the "defendant's article is libelous on its face even if it is

5    susceptible of the innocent interpretation." Id. at 548. Even though not all readers

6    would deem the statement defamatory, it was enough that some readers would deem

7    it so. The question is whether, "when it is addressed to the public at large, it is

8    reasonable to assume that *at least some of the readers* will take it in its defamatory

9    sense." Id. (emphasis added).

10         The decision in *Barnes-Hind, Inc. v. Superior Court,* 181 Cal.App.3d 377,

11   382 (1986), cited by Netflix, follows the learning of *MacLeod* and stands for the

12   same proposition, and thus does nothing to help Netflix. So too, the reliance by

13   Netflix on *Balla v. Hall,* 59 Cal.App.5th 652, 689 (2021), is similarly misplaced.

14   *Balla* held that most of the statements at issue were defamation per se but that one

15   was not—because no readers would understand the defamatory meaning without

16   greater extrinsic context. In contrast, in this case, all readers would understand the

17   defamatory meaning conveyed by the falsehood that she had never played men.

18   Critically, many persons, including the world-wide chess community and citizens of

19   Georgia, knew how extremely offensive and defamatory those statements were.

20         Most crucially, *MacLeod* reveals what Netflix has wrong: confusing the

21   question of a statement's *impact* with its *meaning*. The fact that the damage done by

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 ~ Fax (310) 860-2430

a statement may vary among different segments in society is *different* from the question of whether the defamatory meaning is plain on the face of the statement. Moreover, even the existence of an innocent interpretation "does not establish that the defamatory meaning does not appear from the language itself." *Id.*

The *MacLeod* Court explained that the only function of the special damages requirement in defamation law is to protect a defendant from being caught by surprise, in cases in which the defendant could not have predicted that some readers would have a diminished view of the plaintiff's reputation from the face of the publication. "The purpose of the rule requiring proof of special damages when the defamatory meaning does not appear on the face of the language used is to protect publishers who make statements innocent in themselves that are defamatory only because of extrinsic facts known to the reader." *Id.* For example, to say that John had sex with Mary is not defamatory on its face. If that was all defendant published, the plaintiff would have to establish defamatory meaning through pleading extrinsic facts, such as pleading that John was married to someone else, or that John was a professor and Mary was his student. In short, under Cal. Civ. Code § 46, as well as under *MacLeod*, the Line is defamation *per se*.

### C.   Plaintiff Did Plead Special Damages

Finally, though Plaintiff is not required to plead special damages in support of her defamation per se claim, she did plead special damages, which is another ground for rejecting Netflix's argument. Complaint ¶78. *MacLeod*, 52 Cal.2d at 548.

VIII. <u>**THE LINE IS NOT SUBSTANTIALLY TRUE**</u>

Netflix's argument that the Line that Plaintiff "never faced men" is substantially true is wrong. It is also inconsistent with its argument that the Line is opinion, i.e., a statement that is incapable of being determined true or false.

Netflix argues that Plaintiff cannot establish that she had faced competition in sufficiently *high-level* tournaments before. [Netflix Mem. at p. 22.] But Netflix offers no cogent response to the plain fact that Plaintiff had played against and triumphed over men in high-level tournaments starting domestically in 1959 and internationally since 1963. [NG Decl., ¶¶6-8; Carlin Decl., ¶¶6-12, Exhs 2-3.]

Netflix's song and dance, claiming that it was just off by a few years, is plainly absurd. In fact, <u>she had been playing men in top tournaments for 9 years prior to 1968</u>, and her status as a woman playing chess against men was even more unique in the 1950's and 1960's than it was in later decades. Those few years meant everything to Plaintiff, and would mean everything to the average viewer. Netflix is of course free to try this defense in front of a jury. As the Supreme Court held in *Masson v. New Yorker Magazine., Inc.,* 501 U.S., at 496, the test is whether the statement would "'have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson* 501 U.S. at 517, quoting Robert Sack, *Libel, Slander, and Related Problems* 138 (1980); and *citing Wehling v. Columbia Broadcasting System* 721 F.2d 506, 509 (1983) and Rodney Smolla, *Law of Defamation* § 5.08 (1991).

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 — Fax (310) 860-2430

Under this test the answer is plain. The difference between what Netflix stated—that Plaintiff had never faced men in/before 1968—and what the Complaint alleges, that she had faced many high-ranking men in top tournaments in that period—surely would have a different effect on the mind of the viewer. This Court cannot rule as a matter of law that no reasonable jury could determine that the statement that Plaintiff had never competed against men was false.

## IX. PLAINTIFF HAS SATISFIED THE ACTUAL MALICE STANDARD

### A. Plaintiff Has Shown A Prima Facie Case That Netflix Knew That The Line Was False Because She Had Played Men in/Before 1968

Netflix's argument that Plaintiff has not met her burden of showing a prima facie case of actual malice is constructed on a house of cards. Fundamentally, Netflix has no response to the fact that it deliberately replaced the true statement in the Novel that Plaintiff had faced men, including Soviet grandmasters, to the false Line that she had not faced men.

Frank admitted that the Line is inaccurate, and that he had no basis for making the change. He claims that he changed the Line to show gender segregation, but he did not convey that meaning to the viewer. His unreliability as a witness is further shown by the way in which he contradicted himself during his deposition about when he learned that Plaintiff was a real person. A jury could easily conclude that by altering this text, he engaged in a deliberate fabrication.

Further, as set forth in Section II(A) above, Frank's use of the word "**largely**"

can only mean that when he wrote the Line, he knew that Plaintiff had played at least **some** against male grandmasters **before** the 1970's. This is prima facie evidence that he knew that Plaintiff had played against male grandmasters before the 1970's, and that therefore he knew that the Line was false when he wrote it.

### B.   Actual Malice Can Be Shown For Statements In Fictional Works

Just is there is no "fiction defense" as to other elements of false light or defamation claims arising from a fictional work, there is no "fiction defense" that automatically precludes a finding of "actual malice" arising from works of fiction. See *Bindrim*, 92 Cal.App.3d at 72-73 ("Mitchell's reckless disregard for the truth was apparent from her knowledge of the truth of what transpired. . . [C]ertainly defendant Mitchell was in a position to know the truth or falsity of her own material, and the jury was entitled to find that her publication was in reckless disregard of that truth or with actual knowledge of falsity.").

### C.   Actual Malice May Be Shown By Any Competent Evidence

The self-serving protestations of innocence by Netflix are not enough to defeat this suit. "Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant." *St. Amant v. Thompson,* 390 U.S. 727, 732 (1968). In the words of the Ninth Circuit: "As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions, we try to understand their motives." *Eastwood v.*

1  *National Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997). See also *Guam*

2  *Federation of Teachers, Local 1581, of Am. Federation of Teachers v. Ysrael*, 492

3  F.2d 438, 439 (9th Cir. 1974); *Burnett v. National Enquirer, Inc.,* 144 Cal.App.3d

4

5  991, 1011 (1983). The Court must therefore consider the totality of the

6  circumstances surrounding the decision of Netflix to falsify Plaintiff's record.

7

8          As the Supreme Court has admonished, "[t]he proof of 'actual malice' calls a

9  defendant's state of mind into question, . . . and does not readily lend itself to

10  summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120, n. 9 (1979). This

11

12  is especially true given that "[t]he existence of actual malice may be shown in many

13  ways." *Herbert v. Lando*, 441 U.S. 153, 164, n. 12 (1979). "[A]ny competent

14  evidence, either direct or circumstantial, can be resorted to, and all the relevant

15  circumstances surrounding the transaction may be shown, provided they are not too

16

17  remote, including threats, prior or subsequent defamations, subsequent statements of

18  the defendant, circumstances indicating the existence of rivalry, ill will, or hostility

19  between the parties, facts tending to show a reckless disregard of the plaintiff's

20

21  rights, and . . . custom and usage with respect to the treatment of news items of the

22  nature of the one under consideration." *Id*

23

24          The Complaint, Frank's declaration and deposition testimony, and the

25  declarations of Plaintiff and Nicholas Carlin raise numerous plausible inferences

26  supportive of the existence of reckless disregard for the truth—certainly enough to

27

28  prevail at the pleading stage.

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 ~ Fax (310) 860-2430

### D.    <u>Defendant Who Researches An Issue Is Charged With Knowledge</u>

Those who tout must resolve plain doubt. Netflix may not have had an abstract "duty to investigate" the truth regarding Plaintiff's career, but once it undertook to research it, to alter the text of the Novel, and to hire expert consultants, one of whom knew her personally, the failure to present her career truthfully can only be attributed to a deliberate fabrication or a purposeful avoidance of the truth.

This is a classic example of a situation in which the failure to investigate, if that is what it was, "must fairly be characterized as demonstrating the speaker purposefully avoided the truth or deliberately decided not to acquire knowledge of facts that might confirm the probable falsity of charges." *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 114, (2007), *citing Antonovich v. Superior Court*, 234 Cal.App.3d 1041, 1049, (1991). While the facts lead most plausibly to the inference that Netflix deliberately and knowingly lied, at best the broadcast was a culpable "product of a deliberate decision not to acquire knowledge." *Id.* As in *Balla v. Hall*, 59 Cal. App. 5th at 685, "the evidence here goes well beyond mere lack of investigation, and includes . . . disregard of contradictory input."

In *Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896 (9th Cir. 1992), the Ninth Circuit explained that the *New Yorker Magazine's* own famous reputation for careful fact-checking could be supportive of an inference of actual malice when it failed to resolve discrepancies in the record before it. *Id.* at 901. *Masson* explained that plaintiffs have two paths in establishing reckless disregard for the truth.

RUFUS-ISAACS ACLAND & GRANTHAM LLP

9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 – Fax (310) 860-2430

PLAINTIFF'S OPPOSITION TO SPECIAL MOTION TO STRIKE FIRST AMENDED COMPLAINT

One is to show that a publisher "actually had a high degree of awareness of probable falsity." *Id.* at 900. Plaintiff has satisfied the first path, given the deliberate alteration of the text from the Novel, the use of "largely," and its knowledge of Plaintiff's career.

*Masson* also articulated a second path. "Where such direct proof is missing, the jury may nevertheless infer that the publisher was aware of the falsity if it finds that there were 'obvious reasons to doubt' the accuracy of the story, and that the defendant did not act reasonably in dispelling those doubts." *Id.* "Although failure to investigate will not alone support a finding of actual malice, . . . the purposeful avoidance of the truth is in a different category." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692, (1989).

Plaintiff easily makes her case under the second path as well. A jury could easily find that Netflix *had* to doubt the words it used in the Series given its deliberate alteration of the Novel's text, Frank's use of "largely," the research it undertook, its hiring of consultants who knew Plaintiff, and its admitted knowledge of her career which directly contradicted what Netflix asserted. That is all it takes to deny Netflix' motion on actual malice: "Once doubt exists, however, the publisher must act reasonably in dispelling it." *Masson*, 960 F.2d at 901. "Thus, where the publisher undertakes to investigate the accuracy of a story and learns facts casting doubt on the information contained therein, it may not ignore those doubts, even though it had no duty to conduct the investigation in the first place." *Id.*

### E.   Netflix Researched Plaintiff's Career And Must Have Discovered That Plaintiff Had Played Men Before 1968

As set forth in Section II above, Frank's declaration reveals that he and his team researched Plaintiff's career before he wrote the Line, and that he had learned from this research that she was the women's world champion and one of the Soviet Union's great chess players. Having undertaken such research and gained this knowledge, Netflix cannot now pretend that they did not discover that she had played male opponents many times in or before 1968.

As US National Chess Master Nicholas Carlin states, "[a]nyone who is at all familiar with the game and its history knows of Nona Gaprindashvili. She was very famous for the fact that she was one of the few women .. who played in tournaments with men at the top level." [Carlin Decl., ¶6.] Further, "anyone who is interested in finding out about Ms. Gaprindashvili's career, and in particular whether she had played male chess players in or before 1968, could easily do so by searching the internet, including Wikipedia, www.chessgames.com and other similar websites." [Id., ¶12.] If Frank or his team had gone to her Wikipedia page, they would have read that "[d]uring her career Gaprindashvili successfully competed in men's tournaments, winning (amongst others) the Hastings Challengers tournament in 1963/4..." [Carlin Declaration., ¶7, Exh. 2.] If he or his team had looked on www.chessgames.com, they would have found most of the games that mentioned in her Declaration. [Id., ¶¶9-11, Exh. 3.]

RUFUS-ISAACS ACLAND &
GRANTHAM LLP
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 – Fax (310) 860-2430

### F.   <u>Kasparov Must Have Known That Plaintiff Had Played Men</u>

Another fact which strongly supports the conclusion that Netflix knew that Plaintiff had played men in or before 1968 is that one of its chess consultants, Garry Kasparov, has known Plaintiff personally since around 1980. He recently gave an interview in connection with her 80th birthday, in which he made many kind remarks about her, including that "[s]he became not only the first grandmaster among women but also <u>the first female grandmaster among men</u>." (Emphasis added.) [NG Decl., ¶19, which has more quotes by Kasparov.] Mr. Kasparov must have known that the Line was false, and since he worked for Netflix on the Series, Netflix is charged with his knowledge.

## X.   <u>CONCLUSION</u>

For the reasons argued above, the Motion should be denied. If, arguendo, the Court has any doubts as to whether Plaintiff has shown a prima facie case on actual malice, she requests that the hearing be continued and seeks an order allowing her to take Mr. Kasparov's deposition.

DATED: December 3, 2021          RUFUS-ISAACS ACLAND & GRANTHAM LLP


By:  _____
     Alexander Rufus-Isaacs
     Attorneys for plaintiff Nona Plaintiff

RUFUS-ISAACS ACLAND & GRANTHAM LLP

9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA 90212
Tel (310) 770-1307 • Fax (310) 860-2430

1

## <u>PROOF OF SERVICE</u>

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 9420 Wilshire Blvd., 2nd Floor, Beverly Hills, California 90212.

4

5

On December 3, 2021, I served true copies of the following document(s) described as **PLAINTIFF'S OPPOSITION TO SPECIAL MOTION TO STRIKE FIRST AMENDED COMPLAINT** on the interested parties in this action as follows:

6

7

8

Arwen Johnson
Email: arwen.johnson@kslaw.com
Kelly Perigoe
Email: kperigoe@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071

9

10

11

12

**BY CM/ECF NOTICE OF ELECTRONIC FILING:**  I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

13

14

15

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am a member of the bar of this Court.

16

17

Executed on December 3, 2021, at Beverly Hills, California.

18

19

_____
Alexander Rufus-Isaacs

20

21

22

23

24

25

26

27

28

**RUFUS-ISAACS ACLAND & GRANTHAM LLP**
9420 WILSHIRE BLVD., 2ND FLOOR
BEVERLY HILLS, CALIFORNIA, 90212
Tel (310) 770-1307 - Fax (310) 860-2430

8658.1.6.