# EXHIBIT A

United States District Court
Central District of California

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Nona Gaprindashvili, | Case No. 2:21-cv-07408-VAP-SKx |
| Plaintiff, | |
| v. | **Order DENYING Motion to Dismiss and DENYING Motion to Strike** |
| Netflix, Inc.; Does 1–50 | **(Dkt. 21)** |
| Defendants. | |

Before the Court is Defendant Netflix, Inc.'s Motion to Dismiss or Strike ("Motion") Plaintiff Nona Gaprindashvili's First Amended Complaint ("FAC") pleading claims of false light or in the alternative, defamation. (Dkt. 11).

After considering all the papers filed in support of, and in opposition to, the Motion, the Court deems this matter appropriate for resolution without a hearing pursuant to Local Rule 7-15. The Court **DENIES** the Motion.

## I.    BACKGROUND

This action arises from a statement made about Plaintiff Nona Gaprindashvili in the popular Netflix miniseries, *The Queen's Gambit* ("Series"). (FAC ¶ 1). The Court bases the following summary on the allegations in Plaintiff's complaint.

1

Plaintiff is a trailblazing woman chess player, who throughout her career won many championships, defeated some of the best male chess players in the world, and became the first woman in history to achieve the status of international chess grandmaster among men.  (*Id.* ¶ 2).

In 1983, author Walter Tevis wrote a novel entitled *The Queen's Gambit* ("Novel"), on which the Series is based.  (*Id.* ¶¶ 3, 5).  The Novel's main characters are fictional, but it references a few real chess players, including a passing reference to Plaintiff in the context of the fictional Moscow Invitational chess tournament.  (*Id.* ¶ 3).  The Series, like the Novel, tells the story of a fictional American woman named Elizabeth Harmon ("Beth Harmon" or "Harmon"), an orphan who rises from humble beginnings to become a great chess player.  (*Id.* ¶¶ 3, 5).  The story, set in the 1960s, portrays the systemic sexism of the time and the "prevailing view of the era that there was no place for women at the highest echelons of chess."  (*Id.* ¶¶ 4, 38).  The Series culminates in a fictional chess tournament, the Moscow Invitational, which Harmon receives an invitation to participate in after her triumph in the U.S. Championship.  (*Id.* ¶ 41; Motion at 3).  Significantly, the fictional Moscow Invitational takes place in 1968.  (FAC ¶ 7).

In the first round of the tournament, Harmon plays against fictional chess player Victor Laev, an older male player who Harmon had long admired.  (*Id.* ¶ 41).  After the match between Harmon and Laev ends, the announcer for the tournament, in a voice-over commentary, comments on Harmon's gender to make the point that the male players in the tournament

2

did not take Harmon seriously as an opponent.  (*Id.* ¶ 42).  The announcer states the following:

> [The male players believe] Harmon's level of play wasn't at theirs.  Someone like Laev probably didn't spend a lot of time preparing for their match.  Elizabeth Harmon's not at all an important player by their standards.  The only unusual thing about her, really, is her sex.  And even that's not unique in Russia.  **There's Nona Gaprindashvili, but she's the female world champion and has never faced men**.  My guess is Laev was expecting an easy win, and not at all the 27-move thrashing Beth Harmon just gave him.

(*Id.* ¶ 42 (emphasis in original)).  As Plaintiff's name is mentioned, an actor is shown sitting in the audience who is obviously meant to be Plaintiff.  (*Id.* ¶ 43).  This language, particularly the line referencing Plaintiff ("but [Nona Gaprindashvili] . . . has never faced men") ("Line") is the subject of the lawsuit.

The Line appears to be based on similar text from the Novel, which reads:

> As far as they knew, [Harmon's] level of play was roughly that of Benny Watts, and men like Laev would not devote much time to preparation for playing Benny.  She was not an important player by their standards; the only unusual thing about her was her sex; and even that wasn't unique in Russia.  **There was Nona Gaprindashvili, not up to the level of this tournament, but a player who had met all these Russian Grandmasters many times before**.  Laev would be expecting an easy win.

(*Id.* ¶ 62).

3

United States District Court
Central District of California

The statement that Plaintiff herself had "never faced men," even by 1968, is inaccurate.[1] (*Id.* ¶ 18; Motion at 3). Beginning in 1962 and 1963, Plaintiff competed against and frequently defeated male chess players. In 1965, "she played 28 male players at once."[2] (FAC ¶ 18). Plaintiff began playing chess at the age of thirteen and proceeded to have an extraordinary and successful career. She won the semi-final of the Women's Soviet Union Championship at the age of fourteen. In 1961, she became female World Champion at the age of 20. (*Id.* ¶ 16). She participated in and won medals in Chess Olympiads internationally and faced and defeated men in significant chess tournaments, many of which garnered international attention. (*Id.* ¶¶ 17, 21–26; Decl. of Gaprindashvili ("Gaprindashvili Decl."), Dkt. 28-1 at 4–7 (enumerating accomplishments)). In fact, by 1968, the year in which the episode is set, she had competed against at least 59 male chess players, at least ten of which were Grandmasters of that time, including Dragoljub Velimirovich, Svetozar Gligoric, Paul Keres, Bojan Kurajica, Boris Spassky and Mikhail Tal. The last three were also world champions during their careers. (FAC ¶ 7). Plaintiff later became the first woman in history to be awarded the honor and rank of International Chess Grandmaster among men. (*Id.* ¶ 28).

---

[1] Netflix concedes as much but argues that the Line is fiction and thus not understood to be conveying a fact. (Motion at 2). Netflix additionally argues for a substantial truth defense because the difference between having faced men by 1963 versus 1968 amounts to only a minor inaccuracy. (*Id.* at 3). Both these issues are discussed *infra*.

[2] The FAC shows an image of Plaintiff on one side of a row of men, playing individual chess games down the row of men.

4

United States District Court
Central District of California

During Plaintiff's career, she encountered severe prejudice because she was a woman—and often the only woman—competing amongst men.  (*Id.* ¶ 19).  In 1976, Plaintiff wrote a book in which she described her devotion to chess, the difficulty she faced in overcoming barriers as a woman in that world, and her pride for the part she played in advancing gender equality in the chess world.  (*Id.* ¶ 20 ("The term 'Women's chess' has expired.  I am proud that I have my share in promoting the creative emancipation of women in chess.  I had my share in helping women to overcome psychological barriers separating them from 'man's chess.'")).  Plaintiff is well-known in the chess world and was the subject of many news stories about her accomplishments in tournaments.  (*Id.* ¶¶ 24, 25).  Plaintiff also alleges she is the subject of a film that portrayed her as a "woman who helped revolutionize female chess by taking on male competitors across the globe" and in which she "became a Georgian icon of female emancipation." (*Id.* ¶ 30).

Netflix released all seven episodes of the Series on October 23, 2020.  The final episode, "End Game," contains the scene that features the Line. (*Id.* ¶ 34).  On November 23, 2020, Netflix announced that the Series had been watched by 62 million households since its release.  The Series topped the United States television Nielsen's streaming rankings for three straight weeks, the first series in history to do so.  (*Id.*).

When the Series aired, multiple news outlets and various individual internet users commented on the inaccuracy of the Line.  (*Id.* ¶¶ 48–58). Plaintiff states that the Line "misrepresented one of [her] most significant

**EXHIBIT A**                                                                     **7**

career achievements . . . before millions of viewers worldwide" and "tarnished [her] personal and professional reputation."  (Gaprindashvili Decl. at 9).[3]  To this day, Plaintiff continues to compete in chess tournaments and receive accolades for her accomplishments.  (FAC ¶ 31).  Plaintiff's life-long career is in the world of competitive chess, in which she remains an active leader, role-model, and competitor.  (*Id.* ¶ 77).  Plaintiff contends that the Line cuts to the heart of her hard-won standing in her profession and as a result, injures her current participation in the chess world and ability to earn income from that participation.  This "remains tied to her historical success and accomplishments.  The professional reputation and brand of Gaprindashvili was inextricably bound up with her courageous efforts to face and defeat estimable male opponents when chess was overwhelmingly a man's world."  (*Id.* ¶ 77).

Plaintiff filed suit against Netflix and Does 1–50 on September 16, 2021 and filed the First Amended Complaint ("FAC") on September 20, 2021. (Compl., Dkt. 1; FAC, Dkt. 11).  Plaintiff brings claims for false light invasion of privacy (FAC ¶¶ 69–75), or in the alternative, defamation per se (FAC ¶¶ 76–81).  Netflix moved to dismiss under Federal Rule of Civil Procedure Rule 12(b)(6), or to strike under California's anti-SLAPP statute, California Code of Civil Procedure section 425.16.  (Def. Mot. to Dismiss or Strike ("Motion"), Dkt. 21).  Plaintiff opposed the Motion, and Netflix filed a Reply. (Pl. Opp. ("Opp."), Dkt. 28; Def. Reply ("Reply"), Dkt. 29).

---

[3] For ease of reference, the Court uses the page numbering given by the electronic filing system for the Gaprindashvili Declaration.  All other page references utilize internal page numbering.

**EXHIBIT A**                    **8**

## II.    MOTION TO DISMISS

### A.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief.  Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (holding that the Federal Rules require a plaintiff to provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (quoting Fed. R. Civ. P. 8(a)(2)).); *Bell Atl. Corp. v Twombly*, 550 U.S. 544, 555 (2007).  When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint—as well as any reasonable inferences to be drawn from them—as true and construe them in the light most favorable to the non-moving party. *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005); *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1096 (9th Cir. 2005); *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir. 1994).  "The court need not accept as true, however, allegations that contradict facts that may be judicially noticed by the court."  *Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will

7

not do." *Twombly*, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

The Ninth Circuit has clarified that: (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively" and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Although the scope of review is limited to the contents of the complaint, the Court may also consider exhibits submitted with the complaint, *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990), and "take judicial notice of matters of public record outside the pleadings," *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988).

## B.  False Light

To state a claim for false light invasion of privacy, Plaintiff must demonstrate: (1) disclosure to one or more persons (2) information about or concerning Plaintiff presented as factual but that was actually false or created a false impression about him; (3) that was highly offensive and would injure Plaintiff's reputation; (4) constitutional malice; and (5) Plaintiff suffered damages as a result. *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1082 (9th Cir. 2002) (applying California law). California courts have taken the view that since false light is a division of invasion of privacy tort, the claim must relate to the plaintiff's interest in privacy, and hence cannot involve matters, however offensively misrepresented to the public, which are in essence "public" themselves. *Patton v. Royal Indus., Inc.*, 263 Cal.App.2d 760, 768 (1968). Here, where the challenged statements were exclusively related to Plaintiff's public professional life, she fails to plead that the publication of these statements "intrudes into [her] private li[fe]." *Id.* Because Plaintiff fails to state a claim for false light invasion of privacy, that claim is **DISMISSED** with prejudice.[4]

## C. Defamation Per Se

To establish a claim for defamation, Plaintiff must plead (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged and that (e) has a

---

[4] Plaintiff pleads false light as an alternative theory of liability to the second cause of action for defamation per se. (FAC ¶ 21). Plaintiff's defamation claim, based on the same facts, provides a complete remedy for any damages Plaintiff suffered by the alleged conduct. *See Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123, 1129, 1136 (1985) (affirming denial of false light claim which was in substance equivalent to libel claim). Further, given the claims are entirely based on Plaintiff's public, rather than private, life, amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182.

**EXHIBIT A**          **11**

United States District Court
Central District of California

United States District Court
Central District of California

natural tendency to injure or that causes special damage. *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007). As a public figure, Plaintiff must also plead the requisite constitutional malice. *Reader's Dig. Assn. v. Superior Ct.*, 37 Cal. 3d 244, 256 (1984) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). "Defamation is effected by either of the following: (a) Libel. (b) Slander." Cal Civ. Code § 44. In California, defamation in a television broadcast is treated as slander. *Arno v. Stewart*, 245 Cal. App. 2d 955, 961 (1966). Slander per se is actionable without proof of special damages. Cal. Civ. Code § 46. Slander per se includes such publications which tend to injure a plaintiff with respect to their "office, profession, trade or business, either by imputing to [plaintiff] general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits." Cal. Civ. Code § 46(3). If a plaintiff establishes the Line injured her with respect to her profession or trade, this is sufficient to establish slander per se under section 46(3) and does not require proof of actual damage. *Id.*

Netflix contends that Plaintiff fails to plead the elements of this claim, specifically arguing that: (1) Plaintiff fails to plead falsity because a reasonable viewer would not believe the Line conveyed an objective fact; (2) the Line is not defamatory because it contains no defamatory implication, or because a reasonable viewer would not see the defamatory implication because it relies on information that is not common knowledge; (3) the Line falls under the "substantial truth" defense; and (4) Plaintiff cannot plead the requisite "actual malice." (Motion at 3).

United States District Court
Central District of California

1. <u>Falsity – Whether the Line Conveyed Objective Fact</u>

To state a defamation claim, a plaintiff must present a statement of fact that is provably false. *Seelig v. Infinity Broad. Corp.*, 97 Cal. App. 4th 798, 809 (2002) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)). "Whether published material is reasonably susceptible of an interpretation which implies a provably false assertion of fact . . . is a question of law for the court." *Couch v. San Juan Unified Sch. Dist.*, 33 Cal. App. 4th 1491, 1500 (1995). "This question must be resolved by considering whether the reasonable or 'average' reader would so interpret the material." *Id.* "Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot reasonably [be] interpreted as stating actual facts about an individual." *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1048 (2008) (internal quotations omitted).

Netflix argues that no reasonable viewer would have understood the Line to convey a statement of fact because the Series is an entirely fictional work. (Motion at 12). Netflix points to various cases for the proposition that "[f]ictional works have no obligation to the truth." (Motion at 12 (quoting *Sarver v. Hurt Locker LLC*, No. 2:10-CV-09034-JHN (JCx), 2011 WL 11574477, at *8 (C.D. Cal. Oct. 13, 2011), *aff'd sub nom. Sarver v. Chartier*, 813 F.3d 891 (9th Cir. 2016))).

As an initial matter, Netflix does not cite, and the Court is not aware, of any cases precluding defamation claims for the portrayal of real persons in otherwise fictional works. On the contrary, the fact that the Series was a

fictional work does not insulate Netflix from liability for defamation if all the elements of defamation are otherwise present. *See Bindrim v. Mitchell*, 92 Cal. App. 3d 61, 73 n.2, 76 (1979), *cert. denied*, 444 U.S. 984 (1979), *disapproved of on other grounds by McCoy v. Hearst Corp.*, 42 Cal. 3d 835 (1986) (fictional character in the novel was identifiable as the real person); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995) (creators of docudramas that mix fact and fiction "must attempt to avoid creating the impression that they are asserting objective facts"). The test is whether a reasonable viewer would understand the character to be the person identified and to have the characteristics as described. *See Sarver*, 2011 WL 11574477, at *8. Courts "must look to the specific context in which the statements were made and to the content of the statements themselves" to determine whether the speaker "creat[ed] the impression that they [were] asserting objective facts." *Partington*, 56 F.3d at 1155.

In the last episode, the Series identifies Plaintiff in dialogue by a fictional commentator analyzing fictional character Beth Harmon's likelihood of defeating a fictional chess champion. (FAC ¶¶ 41–42). Despite the presence of fiction surrounding the Line, however, the Court cannot ignore that the Series does reference real people and events and most importantly, the Line identifies a real person, Plaintiff, by name, references her real career, and then shows an actor sitting in the audience who resembles Plaintiff. (*Id.* ¶ 43). In other words, a "physical description," "biographical references" and unique identifying characteristics which "would allow a reasonable person to conclude that the fictional [Nona Gaprindashvili] was in fact the real [Nona Gaprindashvili]" accompany the Line. *Tamkin v. CBS*

United States District Court
Central District of California

*Broad., Inc.*, 193 Cal. App. 4th 133, 147 (2011).  Not only does this close the gap between associating the supposedly fictional character with the real person, but regardless of whether viewers recognized Plaintiff's name (as indeed, some did), viewers may reasonably have believed the comment to be one of these historical details incorporated into the Series.

The Court also considers the presence of the disclaimer that the Series is a work of fiction as a factor in this analysis, albeit not a dispositive one. *Mossack Fonseca & Co. v. Netflix, Inc.*, No. 19-CV-9330-CBM (ASx), 2020 WL 8510342, at *4 (C.D. Cal. Dec. 23, 2020).  The cases that Defendant cites on this point are distinguishable.

In *Mossack*, the court considered a film portraying a law firm that represented clients involved with money laundering, tax evasion, and other criminal conduct.   2020 WL 8510342, at *4.  The court found that no reasonable viewer would believe the film was making "assertions of objective fact," rather than a dramatization, "particularly given the statement at the beginning of the Film 'BASED ON ACTUAL SECRETS' which sets the stage and the disclaimer at the end of the Film that states the Film is fictionalized. . . ."  *Id.*  Here, the Series includes a similar disclaimer, but the Line resembles one of those factual details incorporated into the Series for believability more than it resembles the main plot devices, such as Beth Harmon, or the law firm, which are clearly fictional or at least dramatized.  In *De Havilland v. FX Networks, LLC*, the court found that fictionalized interviews portrayed in the work would not reasonably be interpreted as

literal statements of the actual person, which has little bearing on the issues here.  21 Cal. App. 5th 845, 867–68.

Moreover, the Series purports to be set in a historical setting and does reference real people and events.  (Decl. of Scott Frank ("Frank Decl."), Dkt. 21-7 ¶ 6).  In context, therefore, Netflix "creat[ed] the impression that [it] was asserting objective facts." *Partington*, 56 F.3d at 1155.  Plaintiff sufficiently pleads falsity because the Line is "reasonably susceptible of an interpretation which implies a provably false assertion of fact." *Couch*, 33 Cal. App. 4th at 1500.

2. Defamatory Meaning – Whether the Line Carries a Defamatory Implication and Whether a Reasonable Viewer Would Have Understood a Defamatory Implication

Netflix next argues that even if believed, the Line is not defamatory because a reasonable viewer would not conclude that the Line "never faced men" carries the implication of Plaintiff's inferiority, the defamatory meaning attributed by Plaintiff.  (Motion at 15).[5]  Netflix contends that this implication is inconsistent with the "Series' portrayal of the structural barriers that impeded women's advancement in elite chess during the 1960s."  (Motion at 15).  In other words, Netflix advances an interpretation that Nona Gaprindashvili "never faced men" not because she was inferior, but rather

---

[5] In the alternative, Netflix argues that even if the Line implies inferiority, that implication is statement of opinion rather than a "provably false factual assertion."  Motion 16–17.  In doing so, Netflix confuses the question of defamatory meaning with the element of falsity.  The line between a statement of fact versus opinion is relevant for the latter.  If Netflix concedes the Line carries the implication of inferiority, Plaintiff has adequately pleaded the element of defamatory meaning.

EXHIBIT A                                    16

because she had simply been impeded by the structural barriers depicted in the Series.

Defamation is an invasion of the interest in reputation. *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 27 (2007). A falsehood is defamatory if it "attribute[es] to a person specific misdeeds or certain unfavorable characteristics or qualities, or uttering certain other derogatory statements regarding a person, constitutes slander." *Nguyen-Lam v. Cao*, 171 Cal. App. 4th 858, 867 (2009). In addition to false statements that cause actual damage, the California Legislature has specified slander per se categories, which include false and unprivileged publications that "tend[] directly to injure [a plaintiff] with respect to [her] profession, trade, or business." Cal. Civ. Code § 46.

"If it is determined that the publication is susceptible of a defamatory meaning and also of an innocent and nondefamatory meaning it is for the jury to determine which meaning would be given to it by the average reader." *Patton v. Royal Indus., Inc.*, 263 Cal. App. 2d 760, 765 (1968). "The fact that an applied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself." *O'Connor v. McGraw-Hill, Inc.*, 159 Cal. App. 3d 478, 485 (1984); *see also Solano*, 292 F.3d at 1084 ("[O]ur inquiry is not to determine whether the publication may have an innocent meaning but rather to determine if it reasonably conveys a defamatory meaning.").

15

Here, the Line in context discusses why a male Russian chess master underestimated Beth Harmon.  The commentator delivering the Line explains that Harmon's gender is her most noteworthy characteristic but adds: "even [her gender is] not unique in Russia.  There's Nona Gaprindashvili, **but she's the female world champion and has never faced men**.  My guess is Laev was expecting an easy win . . . ."  (FAC ¶ 63).  The Line clearly conveys an import to the very feat of playing chess against men—not only because men were believed to be better at chess, but also because it was a monumental achievement to break into that world.  Breaking these gender barriers is a primary theme of the Series, which celebrates Harmon for doing just that.  The Line also uses Plaintiff as a comparison point to Harmon, one with lesser achievements.  An average viewer easily could interpret the Line, as Plaintiff contends, as "disparaging the accomplishments of Plaintiff" and "carr[ying] the stigma that women bear a badge of inferiority" that fictional American woman Harmon, but not Plaintiff, could overcome.  (Opp. at 11).  At the very least, the line is dismissive of the accomplishments central to Plaintiff's reputation.  Given Plaintiff's allegations about the role Plaintiff's reputation plays as a matter not merely of personal pride, but in her ongoing professional pursuits, such a falsehood "constitutes an injury to reputation," that "tends directly to injure [Plaintiff] with respect to [her] profession, trade, or business."  *Nguyen-Lam*, 171 Cal. App. 4th at 867; Cal. Civ. Code § 46.

Plaintiff further alleges that viewers did in fact attribute a defamatory meaning to the Line.  (FAC ¶¶ 51–57).  Such evidence, while not dispositive, supports how a "reasonable" viewer might have understood the Line.  *See*

**EXHIBIT A**                                                                                    **18**

United States District Court
Central District of California

*Tah v. Global Witness Publishing, Inc.*, 413 F. Supp. 3d 1, 11–12 (D.D.C. 2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021), *cert. denied*, 2021 WL 5043599 (Nov. 1, 2021).  Because this falsehood tends to "directly to injure [her] in respect to [her] office, profession, trade, or business," it qualifies as defamation per se.  *Balla v. Hall*, 59 Cal. App. 5th 652, 675 (2021), *review denied* (Apr. 14, 2021) (quoting Civ. Code § 46(3)).

Netflix next argues that Plaintiff cannot establish defamation per se because understanding the alleged defamatory implication requires knowledge of competitive Soviet chess in the 1960s.  (Motion at 19).  Netflix argues that the audience "would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons," making the claim defamation *per quod*, which unlike defamation per se, requires proof of special damages.  *McGarry v. Univ. of San Diego*, 154 Cal. App. 4th 97, 112 (2007).

Netflix cites *Balla v. Hall* to no avail.  (Motion at 18 (citing *Balla*, 59 Cal. App. 5th 652)).  In that case, the court held that a campaign advertisement for a politician implying that one of the council members supported the defendant candidate was not per se defamatory because for readers to perceive the advertisement as harmful, they would need to know who the defendant candidate was and his views within that specific community.  *Balla*, 59 Cal. App. 5th at 690.  The Court disagrees that understanding the negative implication of the Line requires any specific knowledge of chess

history.  The statement that a politician supports another political candidate is neutral unless one understands details about both politicians' positions and their constituencies.  In contrast, the defamatory implication of a statement denying a person's notable accomplishments in the world of their profession requires no specific knowledge.  Moreover, injury to one's professional reputation is an enumerated per se category in the California Civil Code.  Cal. Civ. Code § 46(3).

### 3.   Substantial Truth Defense

The substantial truth defense protects allegedly defamatory speech where "the imputation is substantially true so as to justify the 'gist or sting' of the remark," even if there is "slight inaccuracy in the details."  *Heller v. NBCUniversal, Inc.*, No. 15-CV-09631-MWF (KSx), 2016 WL 6583048, at *4 (C.D. Cal. June 29, 2016) (citing *Summit Bank v. Rogers*, 206 Cal. App. 4th 669, 697 (2012)).  An allegedly defamatory statement "is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced."  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17 (1991).

Netflix argues the substantial truth defense bars Plaintiff's claims because "[a] reasonable viewer would have interpreted the Line in context to refer to Plaintiff's never facing male players at significant tournaments in the Soviet Union before 1968."  (Motion at 21)  Even if the Line would be interpreted in this fashion, Plaintiff alleges her "notable successes against men began with her successful entry into the Challengers Section of the Hastings International Chess Congress in England in 1963, which she won,

United States District Court
Central District of California

defeating several male players."  (FAC ¶ 21).  Plaintiff further alleges multiple other notable successes against men in significant tournaments before 1968.  (*Id.* ¶¶ 22–24).  The pleaded truth would have an entirely different "effect on the mind of the reader," *Masson*, 501 U.S. at 516–17, as the truth would have portrayed Plaintiff as a trailblazer that Beth Harmon followed, or another woman chess player on a parallel path.  Instead, the reference to Plaintiff serves to elevate Harmon as being peerless in her achievement of "facing men."

### 4.   Actual Malice Requirement

As a public figure, Plaintiff must plead "actual malice," that is, that Netflix published the defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Reader's Dig. Ass'n. v. Superior Ct.*, 37 Cal. 3d 244, 256 (1984) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)).

"When the expressive work at issue is fiction, or a combination of fact and fiction, the 'actual malice' analysis takes on a further wrinkle."  *De Havilland*, 21 Cal. App. 5th at 870.  After all, "[p]ublishing a fictitious work about a real person cannot mean the author, by virtue of writing fiction, has acted with actual malice."  *Id.*  Recognizing this, California courts require plaintiffs to demonstrate "that [the defamatory statement] either deliberately cast [plaintiff] . . . in an equivocal fashion in the hope of insinuating a defamatory import to the reader, or that [defendant] knew or acted in reckless disregard of whether [its] words would be interpreted by the average reader as defamatory statements of fact."  *Id.* (quoting *Good*

United States District Court
Central District of California

1    *Government Group of Seal Beach, Inc. v. Superior Court*, 22 Cal.3d 672,

2    684 (1978)).

3

4        Plaintiff alleges the text on which the Line was based adapted from the

5    Tevis Novel states: "There was Nona Gaprindashvili, not up to the level of

6    this tournament, but a player who had met all these Russian Grandmasters

7    many times before."  (FAC ¶ 62).  In the declaration of show creator Frank

8    Scott, attached to the Motion, Frank concedes to altering the Line from this

9    text on which he based the plot of the Series.  (Frank Decl. ¶¶ 17–18).  The

10   fact that the creators based the Line on text which states that Plaintiff had

11   not only faced the male Russian Grandmasters, but had in fact faced them

12   "many times before," strongly indicates actual knowledge of the falsity of the

13   statement.  Particularly in light of the text from the Novel, Netflix's argument

14   that it conducted diligent research and "believed [the Line] to be accurate,"

15   (Frank Decl. ¶ 15), is unavailing because either the show creator knew the

16   truth and ignored it, or he "deliberately decided not to acquire knowledge off

17   acts that might confirm the probable falsity of [the Line]."  *McGarry*, 154 Cal.

18   App. 4th at 114.  For this reason, Netflix's argument that it relied on two

19   chess experts to confirm the historical chess details of the screenplay

20   adaptation is also unavailing.  (Motion at 3).  Plaintiff's allegations and

21   submitted declarations demonstrate that "[a]nyone who is at all familiar with

22   the game [of chess] and its history knows of Nona Gaprindashvili" and that

23   "[a]ny simple Google search" would have revealed the truthful information.

24   (Decl. of Nicholas Carlin ("Carlin Decl."), Dkt. 28-2 ¶¶ 6, 7).

25

26

**EXHIBIT A**                                                          **22**

United States District Court
Central District of California

Even considering the fictional nature of the novel and the Series, the decision to use the Line at best demonstrates "that [Netflix] knew or acted in reckless disregard of whether [its] words would be interpreted by the average reader as defamatory statements of fact." *De Havilland*, 21 Cal. App. 5th at 870 (quoting *Good Government Group*, 22 Cal.3d at 684). Although Frank declares he "believed [the Line] to be accurate" and "intended to honor [Plaintiff], not disparage her," (Frank Decl. ¶ 15), the inclusion of the Line evinces a reckless disregard that viewers would interpret the Line as defamatory. *See supra* section II.C.2.

### III.  MOTION TO STRIKE

Netflix moves to strike the FAC on the grounds that it attacks Netflix's constitutionally protected free speech rights in violation of California's anti-SLAPP statute.  Cal. Civ. P. § 425.16.

### A.  Legal Standard

California's anti-SLAPP statute "provides for the early dismissal of certain unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity."  *Robinzine v. Vicory*, 143 Cal. App. 4th 1416, 1420–21 (2006).  An anti-SLAPP motion is available to defendants in federal court.  *Graham-Sult v. Clainos*, 756 F.3d 724, 735 (9th Cir. 2014).

A SLAPP suit is "a meritless lawsuit filed primarily to chill the defendant's exercise of First Amendment rights."  *Paul v. Friedman*, 95 Cal. App. 4th 853, 861 (2002).  California's anti-SLAPP statute allows a defendant to

move to dismiss "certain unmeritorious claims that are brought to thwart constitutionally protected speech or petitioning activity." *Robinzine*, 143 Cal. App. 4th at 1420–21.  To prevail on such a motion, Netflix must make a threshold showing that the challenged cause of action in fact "arise[s] from an act in furtherance of the defendant's rights of petition or free speech." *Graham-Sult*, 756 F.3d at 735 (internal quotations and citation omitted).  If Netflix makes that showing, the burden shifts to plaintiff to show that it has "a reasonable probability of prevailing in its claims for those claims to survive dismissal." *Id.*; Cal. Code Civ. P. § 425.16(b)(1).  "In making its determination [on an anti-SLAPP motion], the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  Cal. Civ. Proc. Code § 425.16(b)(2).  The plaintiff must meet its burden of proving a prima facie case "with admissible evidence." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001); *see also Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co.*, 6 Cal. 5th 931, 940 (2019).

## B.  Evidentiary Objections

Netflix submitted two evidentiary objections to the additional exhibit submitted by Plaintiff (Dkt. 30) in support of her opposition to Netflix's Motion to Strike.  (Dkt. 33).  The Court has not found it necessary to rely on those statements for purposes of this Order, and therefore declines to rule on the objections.

## C.  Arises from Protected Activity

22

United States District Court
Central District of California

A cause of action arises from protected activity within the meaning of section 425.16 if: "(1) defendants' acts underlying the cause of action, and on which the cause of action is based, (2) were acts in furtherance of defendants' right of petition or free speech (3) in connection with a public issue." *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 142–43 (2011). Plaintiff does not contest the first prong, and Netflix has made the required showing that its speech arises form protected activity. First, the act that forms the basis of the claim is the Line in the Series. Second, this act was in furtherance of Netflix's right of free speech. *See id.* at 143 ("The creation of a television show is an exercise of free speech."). Third, the speech was in connection with a public issue, as it features a portrayal of historical gender inequality in the chess world. Accordingly, the cause of action arises from protected activity and falls under California's anti-SLAPP protections, which requires the Court to consider the second prong, Plaintiff's reasonable probability of success on the merits.

### D. Plaintiff's Reasonable Probability of Success on Merits

A court's inquiry at the second prong "is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." *Med. Marijuana, Inc. v. ProjectCBD.com*, 46 Cal. App. 5th 869, 882 (2020). For the reasons discussed above in section II.C., Plaintiff states a legally sufficient claim of defamation per se. The Court next considers whether Plaintiff has made a sufficient prima facie factual showing of admissible evidence.

United States District Court
Central District of California

23

Plaintiff submits admissible evidence sufficient to demonstrate falsity of the Line and to defeat Netflix's defense of substantial truth.  (*See* Gaprindashvili. Decl.).  As to evidence of the Line's defamatory meaning, along with allegations of the Line in context, Plaintiff submits evidence that viewers did in fact interpret the Line as defamatory.  (Declaration of Alexander Rufus-Isaacs ("Rufus-Isaac's Decl.") Dkt. 28-6 ¶¶ 3–10; Rufus-Isaac's Decl. Ex. 6–11, Dkts. 28-7–28-14).  This evidence, though not dispositive, supports the allegation that a "reasonable" viewer would believe the line to be defamatory.  *See Tah*, 413 F. Supp. 3d at 11–12.

Plaintiff further submits evidence supporting the element of actual malice, including a declaration by chess master Nicholas Carlin that "[a]nyone who is at all familiar with the game [of chess] and its history knows of Nona Gaprindashvili.  She was very famous for the fact that she was one of the few women . . . who played in tournaments with men at the top level."  (Carlin Decl. ¶ 6).  As discussed above, Netflix's own evidence demonstrates knowledge of the truth in its choice to deviate from the text of the Novel, which states that Plaintiff had faced the male Russian Grandmasters "many times before."  (*See* Frank Decl. ¶ 15).  Plaintiff further refutes evidence that Netflix relied on chess experts and conducted good faith research, because (1) Plaintiff was well-known in the chess world such that the information would be common knowledge; (2) "[a]ny simple Google search" would reveal the truthful information; and (3) the information was readily available on multiple common websites, as well as common chess-related sites.  (Carlin Decl. ¶ 7; Carlin Decl. Ex. 2, Dkt. 28-4 (Nona Gaprindashvili's Wikipedia page).  Plaintiff has made a prima facie factual

24

showing sufficient to sustain a favorable judgment; evidence that Netflix fails to overcome at this stage.

Accordingly, the Court **DENIES** Netflix's motion to strike.

### IV.    CONCLUSION

The Court therefore **DENIES** Netflix's Motion to Dismiss and **DENIES** Netflix's Motion to Strike.

**IT IS SO ORDERED.**

Dated:    1/27/22

Virginia A. Phillips
United States District Judge

**EXHIBIT A**                    27